UNITED STATES of America, ex rel., David RIDENOUR, et al., Plaintiffs,

v.

KAISER–HILL COMPANY, L.L.C., et al., Defendants.

No. 97–WM–2191.

United States District Court, D. Colorado.

Sept. 27, 2001.

James R. Christoph, McCormick & Christoph, P.C., Boulder, CO, Stanley M. Chesley, Louise M. Roselle, Waite, Schneider, Bayless & Chesley Co., L.P.A., Cincinnati, OH, Jacqueline P. Taylor, Bruce Jean–Pierre Pederson, Pederson & Taylor, LLC, Lakewood, CO, Wilbert Benjamin Markovits, Markovits & Greiwe Co., L.P.A., Phyllis E. Brown, Copeland & Brown Co., L.P.A., Cincinnati, OH, for plaintiffs.

Colin Christopher Deihl, Morgan Anna Costello, Luis Michael Agosto, Faegre & Benson, United States District Court, Gail D. Zirkelbach, Michael D. Schag, McKenna & Cuneo, Denver, CO, Tom Heiden, G. Kellum Scott, Kaiser–Hill Company, LLC, Golden, CO, for defendants.

## ORDER ON RECOMMENDATION OF MAGISTRATE JUDGE

MILLER, District Judge.

This matter is before me on the recommendation of Magistrate Judge Patricia A.

Coan, issued August 7, 2001, that the United States's motion to dismiss be granted, that claims one and two of the second amended complaint be dismissed with prejudice, and that defendants be directed to file an answer or other response to claim three of the second amended complaint within twenty days of this order. Relators filed a timely objection to the recommendation. 28 U.S.C. § 636(b).

I have reviewed *de novo* the pertinent portions of the record in this case, including the government's motion, the parties' briefs thereon, the recommendation, relators' objections, and the government's responses to those objections.[1] I have not read a transcript of the evidentiary hearing held by Magistrate Judge Coan, because relators failed to provide such a transcript. Fed.R.Civ.P. 72(b). I have, however, considered the parties' descriptions of the testimony and evidence presented at the hearing. Based upon this review, I conclude the recommendation should be accepted.

In my January 17, 2001 order, I agreed with Magistrate Judge Coan, over relators' objection, that the standard for dismissal by the government of this *qui tam* action is whether that dismissal is rationally related to a legitimate government purpose. *United States ex rel. Sequoia Orange Co. v. Baird–Neece Packing Corp.,* 151 F.3d 1139, 1145 (9th Cir.1998), *cert. denied,* 525 U.S. 1067, 119 S.Ct. 794, 142 L.Ed.2d 657 (1999). The recommendation properly follows the two-step analysis of the *Sequoia* case, addressing first whether the government identified a legitimate governmental purpose and second whether it demonstrated a rational relationship between dismissal and the accomplishment of that pur-

---

**1.** Defendants also filed responses to the relators' objections. Because relators have objected to defendants' involvement in the evidentiary hearing held by Magistrate Judge Coan and because defendants' responses are not necessary to the resolution of the issues presented in the recommendation, I have not considered those responses here.

pose. After concluding the government had met its burden (that dismissal was rationally related to protection of national security interests and also to protection against delay in the closing of the Rocky Flats Environmental Technology Site (Rocky Flats)), Magistrate Judge Coan considered whether the relators had carried their burden of showing that the dismissal was fraudulent, arbitrary and capricious, or illegal. 151 F.3d at 1145.

Relators concede two parts of the government's case: that the protection of national security is a legitimate governmental interest, and that (in the abstract) the timely closure of Rocky Flats is a legitimate governmental interest. They contend, however, that the government failed to prove dismissal of the complaint is rationally related to these interests. Further, they argue the recommendation improperly shifted the burden to them to prove their case without using classified material and to prove they could prevail without delaying the scheduled closure of Rocky Flats. They point to alleged weaknesses in Magistrate Judge Coan's conclusions as evidence that the government did not prove its case.[2]

■ Relators incorrectly interpret the rational relation standard of review. "[T]he government's power to dismiss or settle [a *qui tam* ] action is broad." *Sequoia*, 151 F.3d at 1144. The *Sequoia* standard merely requires that the government justify its motion to dismiss by identifying a valid government purpose and showing a rational relation between dismissal and that purpose. *Id.* at 1145. There is no requirement that the government prove conclusively that, absent dismissal, the identified government interests will be adversely affected. *See id.* at 1146–47 (evidence that problems with lemon marketing were *"potentially* as pervasive" as those in orange industry was sufficient to extend dismissal to lemon industry action) (emphasis added).

The *Sequoia* standard is similar to the rational basis review of administrative action or statutory classification. *See, e.g., Romer v. Evans*, 517 U.S. 620, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996) ("if a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end"). In the context of review of county-imposed limitations on land use, the Tenth Circuit has held that a constitutional challenge to such limitations can prevail "only if the *alleged* purpose behind the state action has no *conceivable* rational relationship to the [state's asserted interest or power]." *Crider v. Board of County Comm'rs of Boulder County*, 246 F.3d 1285, 1289 (10th Cir.2001) (emphasis added), *petition for cert. filed* (July 17, 2001). The actual purpose of the state action at the time of the action is irrelevant for rational basis analysis. *Id.* at 1289–90. *See also Federal Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993) (statutory classification that does not infringe fundamental constitutional rights or follow suspect lines survives equal protection challenge "if there is any reasonably conceivable state of facts

2. For instance, on the issue of whether the use of classified documents in this case would present national security risks, relators claim the government did not prove whether the relevant documents could be declassified or redacted or whether the risk of inadvertent disclosure of classified documents (if not de-classified or redacted) would be significant. On the issue of the timely closure of Rocky Flats, relators contend the government failed to show, with credible evidence, that the alleged diversion of security and management personnel would actually occur or, if it did occur, would actually cause delay.

that could provide a rational basis for the classification").

■ As these cases demonstrate, the government here met its burden under the rational relationship standard when it identified legitimate government interests and showed that there was a rational (even if not certain) relationship between accomplishment of those purposes and dismissal. Accordingly, relators' objections on this issue are overruled.

Relators also argue Magistrate Judge Coan erroneously found they had not met their burden of proof that the government's motion to dismiss was fraudulent, arbitrary and capricious, or illegal. *Sequoia*, 151 F.3d at 1145. I agree with the recommendation on this issue. Relators failed to negate every conceivable basis that could support the government's decision to dismiss, *Beach Communications*, 113 S.Ct. at 2101, or to show that fraudulent or illegal purposes were the true motivations behind that decision.

Relators' remaining objections are without merit.

Accordingly, it is ordered:

1. The recommendation issued by Magistrate Judge Coan on August 7, 2001, is accepted.

2. The motion to dismiss filed by the United States on August 21, 2000, is granted.

3. Claims one and two of the second amended complaint (alleging violations of 31 U.S.C. § 3729(a)(1), (a)(2), and (a)(3)) are dismissed with prejudice.

4. Defendants shall file an answer or other response to claim three of the second amended complaint (alleging con-

structive discharge) within twenty days of this order.

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

COAN, United States Magistrate Judge.

This is a qui tam action under the False Claims Act. The matter before the court is the United States' Motion to Dismiss [filed August 21, 2000]. An Order of Reference under 28 U.S.C. § 636(b)(1)(A) and (B) referred this case to the undersigned magistrate judge on April 6, 2000 to issue recommendations on dispositive motions.

### I.

The False Claims Act ("FCA" or "Act"), 31 U.S.C. § 3729 and § 3730, as amended by the False Claims Amendments Act, Pub.L. 99–562, 100 Stat. 3153 (1986), empowers the United States ("Government") or a private person to bring a civil action against a person or company who knowingly presents a false claim to the Government for payment, in violation of 31 U.S.C. § 3729(a). 31 U.S.C. § 3730(a) and (b)(1). The private citizen who brings an action under § 3730(b)(1), the "relator," sues on behalf of himself and the United States in what is known as a qui tam action.[1] The Act authorizes the Government to recover treble damages plus a statutory penalty of $5,000 to $10,000 for each false claim. 31 U.S.C. § 3729(a). The relator is entitled to receive up to thirty percent of the proceeds realized from the action or settlement, depending on the relator's role in prosecuting the litigation, plus his attorney's fees and costs. 31 U.S.C. § 3730(d).

The instant qui tam action is brought by relators David Ridenour, who was a di-

---

**1.** The term "qui tam" is short for the Latin phrase "qui tam pro domino rege quam pro se ipso in hac parte sequitur," meaning "who pursues this action on our Lord the King's behalf as well as his own." *Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 765, 120 S.Ct. 1858, 1860 n. 1, 146 L.Ed.2d 836 (citing 3 W. Blackstone, Commentaries *160).

rector of safeguards and security at Rocky Flats in 1997, Jeffrey Peters, who was employed by defendant Wackenhut and held various management positions related to security at Rocky Flats from 1990 to 1996, and Mark Graf, who was hired by defendant Wackenhut in 1990 and is currently a lieutenant in the protective force. The relators filed their original qui tam complaint under seal on October 8, 1997. The Government declined to intervene in the action on December 6, 1999, after conducting a two-year investigation into the allegations of the complaint. The complaint was unsealed on December 14, 1999.[2] The operative pleading is the Second Amended Complaint, filed on May 22, 2000. Defendants have not filed an Answer and the proceedings have been stayed pending determination of the United States' Motion to Dismiss.

The allegations of the Second Amended Complaint are summarized as follows: In 1995, the Department of Energy ("DOE") awarded Kaiser–Hill Co., LLC ("Kaiser–Hill") the contract for environmental clean up at the Rocky Flats Environmental Technology Site ("Rocky Flats"), a former nuclear weapons component manufacturing facility. Since 1995, Kaiser–Hill has subcontracted the portion of the contract involving security and protective force work to Wackenhut Services Co, LLC ("Wackenhut"). Between 1989 and 1995, defendant EG & G Rocky Flats, Inc. ("EG &

G") was the prime contractor with DOE for management and operations at Rocky Flats and was responsible for security at the site. When EG & G served as primary contractor, Wackenhut contracted directly with the DOE to provide security services at Rocky Flats. Relators allege that the DOE has paid the defendants millions of dollars to provide security for the Special Nuclear Material[3] ("SNM") at the Rocky Flats site. Each of the defendant's cost plus award fee contracts with the DOE required compliance with all applicable DOE orders and regulations regarding nuclear safety. Relators assert that between January 1990 and May 2000, defendants billed and received payment for providing security for weapons grade SNM which was either not provided at all, was substandard or defective, or was provided in violation of applicable rules, regulations, or contractual provisions. Relators allege that during the entire period relevant to the Second Amended Complaint, SNM at Rocky Flats was at high risk.

The Second Amended Complaint asserts, *inter alia*, that defendants: violated 31 U.S.C. § 3729(a)(1) and (a)(2), in knowingly presenting to the United States Government false claims for payment or approval under contracts funded with Government monies, which resulted in payment by the United States for work that was not performed or not performed in the manner represented by defendants; and, conspired to defraud the United

---

**2.** The statute requires that a qui tam complaint be filed *in camera,* remain under seal for at least sixty days, and not be served on the defendant until the court so orders. 31 U.S.C. § 3730(b)(2). During the period in which the complaint is sealed, the relators must provide a copy of the complaint and written disclosure of all material evidence and information in their possession to the Government so that the Government may investigate the complaint's allegations. *Id.* Prior to the expiration of the sixty-day period or any extended deadline granted by the court,

the Government may intervene and proceed with the action. *Id.;* § 3730(b)(3). If the Government elects not to intervene, the relators who filed the action may proceed on their own. § 3730(c)(3). The court may permit the Government to intervene at a later time upon a showing of good cause. *Id.*

**3.** Special Nuclear Material includes plutonium, plutonium uranium combinations and enriched uranium. (Government's Ex. K, p. 7)

States by "getting a false or fraudulent claim allowed or paid," in violation of 31 U.S.C. § 3729(a)(3).[4] Relators seek to recover millions of dollars in damages and civil penalties on behalf of the United States and themselves.

The United States moves to dismiss this action under 31 U.S.C. § 3730(c)(2)(A), which states, in pertinent part: "The Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion." The asserted grounds for dismissal are that continuation of this litigation threatens the timely closure of Rocky Flats and national security interests.

On January 17, 2001, the District Judge held that the False Claims Act empowered

4. The second amended complaint contains what relators refer to as ten "discrete" claims: (1) between 1990 and 2000, the contractors made false claims for payment for protective force personnel training which was not completed or was not in compliance with DOE orders and regulations (Second Amended Complaint, ¶¶ 29–41); (2) the 1994 and 1997 Site Safeguard and Security Plans ("SSSPs") were false documents because the contractors represented to the DOE a higher level of security and a lower level of risk than actually existed (id. at ¶¶ 42–53); (3) the defendants falsely represented in the 1994 and 1997 SSSPs that the protective force was taking the requisite compensatory measure of verifying, on a daily basis, the attachment of a security seal to the metal grating installed at the mouth of each drainage culvert (id. at ¶¶ 54–63); (4) the contractors purchased partially mobile, bullet proof wedges, known as hardened fighting positions, a necessary compensatory measure to reduce high risk, but falsely represented to the DOE in the 1994 and 1997 SSSPs, and up through October 1999, that the hardened fighting positions were installed and operational, and that the requisite training and performance testing had been completed (id. at ¶¶ 64–72); (5) between 1990 and 2000, the contractors represented to the DOE that the stacker/retriever, an automated storage system for SNM, complied with DOE regulations for a SNM vault, but defendants failed to make necessary modifications, or implement compensatory measures specified in the 1994 and 1997 SSSPs, to meet physical security requirements and reduce high risk (id. at ¶¶ 73–83); (6) in October 1995, Kaiser–Hill moved SNM from an authorized storage vault to a room that was not a vault or vault-type room, without taking requisite measures to determine what physical protection or comprehensive measures

were required to ensure an acceptable level of risk, in violation of the 1994 SSSP and DOE orders; (7) in the Fall of 1995, the contractors removed the "400 area," a fenced Classified Security area which contained classified files and parts and therefore had strict access controls, from Wackenhut physical access control without complying with a DOE order governing diminished security, but collected an award fee for the performance measure (id. at ¶¶ 96–104); (8) in the 1997 SSSP, defendants falsely claimed that minimum upgrades to the alarm system were sufficient to meet DOE requirements regarding the protection of SNM, despite the fact that defendants had determined in 1992 and in 1996 that complete replacement of the alarm system was the only means of complying with DOE-mandated levels of security (id. at ¶¶ 105–113); (9) between 1991 and 1997, the radio system installed by EG & G was never performance tested against adversary jamming by EG & G or Kaiser–Hill, in violation of a DOE order and applicable contract provisions, resulting in a high level of risk to overall security (id. at ¶¶ 114–116); and (10) during the 1990's, the contractors failed to provide the level of security required by DOE orders and regulations, and by their contracts with DOE, resulting in a general failure of security at Rocky Flats and high risk to SNM, but represented that security was at an acceptable level in their claims for payment (id. at ¶¶ 117–121).

The second amended complaint also asserts that relator Ridenour was constructively discharged by his employer, the DOE, on April 10, 1997, because of his whistle-blowing activities, in violation of 31 U.S.C. § 3730(h). That claim is not at issue in this Recommendation, however.

the Government to dismiss a meritorious qui tam action, even though the Government initially declined to participate in the action, and, that the Government had demonstrated good cause for late intervention. *See* January 17, 2001 Order on Magistrate Recommendation, adopting, with modification, the November 28, 2000 Recommendation of United States Magistrate Judge. The District Judge further determined that the standard set forth in *United States ex rel. Sequoia Orange Co. v. Baird–Neece Packing Corporation ("Sequoia Orange")*, 151 F.3d 1139 (9th Cir. 1998), governed disposition of the Government's Motion to Dismiss. *Id.* Under *Sequoia Orange*, the Government must identify a valid governmental purpose and demonstrate that dismissal of the qui tam action is rationally related to accomplishment of that purpose. 151 F.3d at 1145. If the Government meets its burden, the burden then switches to the relators "to demonstrate that dismissal is fraudulent, arbitrary and capricious, or illegal." *Id.* (quoting *United States ex rel. Sequoia Orange Co. v. Baird–Neece Packing Corp.*, 912 F.Supp. 1325, 1347 (E.D.Cal.1995)). The District Judge referred the matter to the undersigned to conduct an evidentiary hearing to determine whether the Government has met its burden under *Sequoia Orange*, and if so, whether the relators have satisfied their evidentiary burden so that dismissal of their qui tam action is precluded. *See* January 17, 2001 Order on Magistrate Judge Recommendation.

The undersigned held an evidentiary hearing on July 9, 10, 11 and 12 and received closing arguments from the parties on July 13, 2001. At the beginning of the evidentiary hearing, the parties stipulated that the relators' claims were meritorious for purposes of resolving the United States' Motion to Dismiss. The parties further stipulated that classified information would be excluded from the evidentiary hearing and also agreed to the presence of a classification officer, Janet Nesheim, who was given authority to prohibit a particular line of questioning or testimony based on her determination that classified information would be implicated.

## II.

### A. Has the Government Satisfied the Two–Part Test under Sequoia Orange?

Under the *Sequoia Orange* standard, the Executive Branch has broad discretion under the False Claims Act to dismiss a qui tam action, even if the action is meritorious, so long as the reasons for dismissal are rationally related to a legitimate Government interest. 151 F.3d at 1145. The court addresses the Government's articulated bases for dismissal in turn.

#### 1. Threat to National Security Interests

The Government first asserts that dismissal is rationally related to the Government's legitimate interest in protecting national security because the large number of classified documents involved in this case creates an unacceptable risk of inadvertent disclosure.

The primary witnesses for the Government and the defendants on the issue were Barbara Stone, the Director of the DOE Office of Safeguards and Securities Evaluations, Rodney Hoffman, DOE field classification officer at Rocky Flats, Martin Anderson, Wackenhut manager of security planning and integration, and Steven Cunningham, Kaiser–Hill program manager and classification officer. The primary witnesses for the relators were Colonel Edward McCallum, a former original classifier and declassifier for the DOE, and relator Mark Graf, a derivative classifier.

The parties agree that classified information will be involved in the litigation of

this case, but disagree about the quantity of classified documents needed. Because discovery has been stayed, each party could offer only a preliminary lay opinion about the number of classified documents at issue. Relators' position is that their claims can be proven with limited reference to classified documents. Mark Graf testified that less than ten classified documents would be needed to establish one or more of the relators' claims, except for the "general failure of security" claim, which would involve approximately thirty classified documents. Witnesses for the Government and defendants opined that the defense of relators' allegations that security at Rocky Flats was at high risk for a decade would require the review of thousands of classified documents. Martin Anderson and Barbara Stone testified that numerous classified documents are potentially relevant to the security issues raised by the relators, including the 1994 and 1997 SSSPs, comment resolution documents, vulnerability assessments, modeling data, most physical security systems documents, and performance testing results.

It is unknown at this time whether classified documents relevant to this litigation could be declassified or meaningfully redacted. The evidence was that a classified document can be declassified if the declassifier determines that the vulnerability no longer exists at the Rocky Flats site, or at any other DOE site. (Stone, Hoffman, Cunningham and McCallum testimony) Redaction means that the classified information is removed from the document and the remainder of the document is unclassified and can be disclosed to persons who do not hold a security clearance. (Hoffman testimony)

Pursuant to Executive Order ("EO") 12958, promulgated April 17, 1995, documents at Rocky Flats which were classified after April 1995 are portion-marked, which means that classified areas of a document, and automatic declassification areas, are identified on a section-by-section basis.[5] (Hoffman testimony; Government Ex. G-2, § 1.7) Hoffman testified that, pursuant to the directives in E.O. 12958, if a document can be declassified or desensitized,[6] then it should be. Most of the documents relevant to this litigation concern safeguards and securities. (Hoffman testimony) Some of the safeguards and securities documents at Rocky Flats which are currently classified are marked to automatically declassify upon the occurrence of a date or event. (*Id.*) When the declassification event or date occurs, the document must be reviewed by the DOE or contractor classification office before it is released publicly. (Hoffman, Cunningham testimony) Only a minimal number of documents at Rocky Flats have been declassified. (Hoffman testimony)

In addition to declassification and redaction, DOE must take into account the effect of mosaic compilation, i.e., two or more pieces of unclassified information may become classified when they are associated. (Stone, Hoffman testimony) Non classified materials must be reviewed for potential mosaic compilation effect. (*Id.*) None of the witnesses testified that they have ever seen the effect of mosaic compilation.

---

**5.** E.O. 12958 prescribes a uniform system for classifying, safeguarding and declassifying national security information. (Government's Ex. G-2) Section 1.7 provides that at the time of original classification, the face of each classified document shall reflect, *inter alia*, the date or event for declassification, the date that is ten years from the date of original classification, or the exemption category from declassification. (*Id.*)

**6.** "Sensitive information" is Unclassified Controlled Nuclear Information concerning nuclear material, weapons, and components that is restricted in use. (Government Ex. G-3, p. 4)

The evidence was undisputed that any individual involved in this litigation would need a security clearance to handle or review classified material, including the attorneys and their staff, the judge and court staff, and the jurors; however, no security clearances are needed to review declassified or redacted material. Hoffman testified that in his prior experience with litigation involving Rocky Flats, neither the judge nor the jurors have ever needed a security clearance. There was no evidence that classified information has ever been disclosed during the course of litigation, save for a single instance of inadvertent disclosure by a DOE attorney.

Protection of the national security is undoubtedly a legitimate governmental interest. If classified documents relevant to this litigation cannot be declassified or redacted, then there is a risk of inadvertent disclosure of nuclear security information because everyone who reviews, handles, and discusses the classified information must possess a security clearance. If a number of people have security clearances, the risk of inadvertent disclosure is greater. The risk is lessened when the classified materials can be declassified or redacted because then presumably only the attorneys may need to review the classified versions of the documents. The evidence showed that in other qui tam cases involving classified information, the attorneys were issued security clearances to review the classified information and no inadvertent disclosures occurred. The classified information at issue in those cases was probably redacted or declassified at some point, however, because there was no need to issue security clearances to the judge or jurors. If the classified mate-

rial needed to prosecute and defend this action is not subject to declassification or redaction, the risk of an inadvertent disclosure by one of the numerous persons who will be required to hold a security clearance is not insignificant and dismissal of this action would clearly advance the Government's legitimate interest in protecting the national security. On the other hand, if the relevant classified information is subject to declassification or redaction, the relationship between dismissal of the action and elimination of a threat to national security interests is much weaker. As noted by the district court in *Sequoia Orange*, however, even when the legitimate interest articulated by the Government is only "incidentally advanced," the rational relationship test has been satisfied. *See* 912 F.Supp. at 1343. Thus, even if the risk of inadvertent disclosure of classified information in this litigation is minimal, the risk is still present. The court finds that the Government has satisfied its burden to show that dismissal of this action is rationally related to protection of national security interests.

### 2. *Timely Closure of Rocky Flats*

The Government contends that continuation of this qui tam litigation will delay the timely closure of Rocky Flats, scheduled for December 15, 2006, by interfering with the job performance of the DOE and contractor employees whose expertise is necessary to accomplish the closure and by diverting the limited funds appropriated for the closure project to litigation expenses. The Government emphasizes that the timely closure of Rocky Flats is of paramount public interest because the radiologically-contaminated Superfund site [7]

---

7. At the evidentiary hearing, the parties stipulated that the Environmental Protection Agency has designated Rocky Flats as a Superfund site under CERCLA, the Comprehensive Environmental Response, Compensation and Lia-

bility Act of 1980, 42 U.S.C. §§ 9601, *et seq.* The Superfund is the general federal fund for hazardous waste management under CERCLA. 42 U.S.C. § 9611.

poses a serious risk to human health and the environment and is costing taxpayers millions of dollars a year to maintain.

The parties stipulated at the evidentiary hearing that plutonium, acid, and chemical wastes present at the Rocky Flats site are a public health and safety risk. Two buildings at the Rocky Flats site, # 771 and # 776, were identified in a 1994 DOE Report as the most vulnerable facilities within the DOE complex. (Government's Ex. H, DOE Plutonium Working Group Report on Environmental, Safety and Heath Vulnerabilities, dated November 1994, p. vi [8]) Three other buildings at Rocky Flats, # 779, # 707, and # 371, were included within the top ten most vulnerable sites. (*Id.*) More than two and a half million people live within a fifty-mile radius of Rocky Flats. (Government's Ex. T, Rocky Flats Closure Project Management Plan, dated June 1998, p. 5) The court finds, and relators do not dispute, that the accelerated closure of Rocky Flats is a legitimate Governmental interest.

At issue is whether dismissal of this qui tam action will advance the Government's legitimate interest in the accelerated closure of Rocky Flats. The primary witnesses who testified in support of the Government's contention that this qui tam suit may interfere with the timely closure of Rocky Flats were James Owendoff, Principal Deputy Assistant Secretary for Environmental Management, at DOE headquarters in Washington, D.C. since 1995, Paul Golan, Deputy Manager of the Rocky Flats Field Office at Rocky Flats since November 1999, and James Steward, Director of Safeguards and Security at Rocky Flats since June 1997. The relators' primary witness to refute the Government's position was Mark Graf, an alarm station program manager for Wackenhut's protective force.

### a. *Proposed Factual Findings*

In 1992, Rocky Flats' mission changed from the production of nuclear weapons components to environmental waste management and cleanup. (Golan, Owendoff testimony) When production was shut down, the nuclear components were in various forms of storage. (Owendoff testimony) The DOE was charged with stabilizing the plutonium and cleaning up the contamination. (*Id.*) Closure of Rocky Flats became a DOE priority because of the high levels of radioactive waste present at the site which are not in a condition which is safe for long-term storage. (*Id.*) The original closure deadline established by the DOE was 2060. (Golan testimony) In 1995, the DOE negotiated the first performance-based contract with Kaiser–Hill which projected a closure date of 2015. (*Id.*) The Rocky Flats Cleanup Agreement was signed by the DOE, Colorado Department of Public Health and the Environment and the EPA in 1996. (*Id.;* Government's Ex. K) In October 1997, then Secretary of Energy Frederico Pena designated Rocky Flats as a pilot site for clean up and projected closure within ten years. (Golan testimony; Government's Ex. M; February 2001 GAO Report, Relators' Ex. 39, p. 1)

Owendoff and Golan negotiated the DOE closure contract with Kaiser–Hill which was signed in January 2000. (Owendoff, Golan testimony) The DOE did not competitively bid the closure contract because of concerns that the time involved in the bidding process and in bringing a new contractor up to speed would delay the

---

8. The DOE Plutonium Working Group Report defined vulnerabilities as "degradation in plutonium materials and packaging, and weaknesses in facilities and administrative controls that can result in inadvertent releases of plutonium that can expose workers and the public, or contaminate the environment." (Government's Ex. H. p. vi)

target closure date of December 15, 2006 by as much as one year. (Owendoff, Golan testimony; Government's Ex. L, July 29, 1999 Memo from Secretary of Energy Richardson) Further, the DOE was generally satisfied with Kaiser–Hill's performance. (*Id.*) The closure contract is a cost plus incentive fee contract. (Contract/Award, Government's Ex. J) The amount of the incentive fee Kaiser–Hill will receive ranges between $130 million and $460 million depending upon the costs incurred and whether Kaiser–Hill closes Rocky Flats before, on, or after, the target closure date of December 15, 2006. (*Id.*; Relators' Ex. 39, pp. 16–17) The closure contract is flat-funded through a separate Congressional appropriation of approximately $650 million per year which was established in fiscal year 1998. (Golan, Owendoff testimony) Congress authorized the special appropriation after determining that accelerated closure of Rocky Flats by 2006 is in the public's best interest. (*Id.*)

As set forth in the Rocky Flats Closure Project Management Plan, dated June 29, 1998, accelerated closure will: (1) eliminate a "major safety and environmental risk"; (2) eliminate the $400 million annual cost (approximately $1 million a day) of safeguarding nuclear material and maintaining a safe work environment at Rocky Flats; (3) contribute "important lessons learned" and establish "a blueprint to be followed for the difficult cleanup challenges faced by other sites in the DOE weapons complex"; and (4) demonstrate to Congress and the public that the DOE can "successfully meet the challenge of efficient and safe environmental clean up." (Government's Ex. T, pp. 5–6; Owendoff, Steward and Golan testimony). The Government maintains that litigation of this action will negatively impact the projected closure date of December 15, 2006 by diverting the focus of security planners, including vulnerability analysts, and managers away from the closure project. The

Government further maintains that the necessary review of classified documents for declassification or redaction will divert the attention of additional personnel and funds away from the closure project.

Paul Golan brought his concerns about the impact of this qui tam suit on the accelerated closure of Rocky Flats to DOE/Rocky Flats counsel and to the Department of Justice ("DOJ") because, in his opinion, the benefits the DOE will realize through accelerated closure of Rocky Flats, i.e. elimination of public safety risk and $1 million per day in maintenance fees, outweigh the benefits which could be realized from the successful prosecution of this action. (Golan testimony) If closure is not completed by the 2006 target date, Congressional funding may decrease significantly, daily maintenance costs will be extended, and other maintenance issues which currently are being ignored because of expedited closure would have to be addressed at the site. (Owendoff, Golan testimony) Other DOE sites have already suffered a reduction in funds due to Congressional cuts to the DOE budget this year. (*Id.*)

Evidence on each area of this lawsuit's possible impact on the target closure date was presented at the hearing as follows.

1. *Diversion of security planners*

The closure project contemplates 15,000 discrete activities which are represented in a critical path developed by Kaiser–Hill. (Golan testimony) The critical path is defined such that if the completion of one of those activities is delayed by one week, the closure of Rocky Flats is delayed by one week. (*Id.*) The major activities involved in the closure project include the continued stabilization, consolidation and protection of nuclear materials, the safe shipment of those materials to designated sites around the country, and the decommission and

demolition of the contaminated buildings that formerly contained the nuclear materials. (Owendoff, Golan testimony) At this time, the DOE is reducing the size of the protected area, the area where SNM is stored, so that demolition workers who do not have security clearances will have extensive access to the buildings which formerly contained the Category 1 and 2 SNM, buildings # 771 and # 776. (Steward testimony) The Kaiser–Hill vulnerability analysts are installing a fence system in the new protective area surrounding building # 371, the building where all Category 1 and 2 SNM is currently stored. (Steward, Owendoff testimony)

Vulnerability analyses are important to the closure project to ensure the continued protection of SNM. (Steward testimony) A vulnerability analysis involves the identification of targets, i.e., SNM or classified material, analysis of what measures are in place to protect the targets, analysis of possible areas of vulnerability where the adversary could penetrate, and analysis of what protective force systems could effectively neutralize such a penetration. (Steward testimony) Several layers of protection are in place at Rocky Flats and thousands of variables affect each security layer. (*Id.*) Each variable identified by the vulnerability analysts is entered into a computer program and the program calculates whether the overall security risk to the site is low, medium or high. (*Id.*) If the risk is high, the analyst team must then look at potential compensatory measures to reduce the particular risk and any physical changes are then entered into the computer program. (*Id.*) The new variable(s) may adversely affect a different security layer and the whole process will have to be repeated. (*Id.*)

There are limited key personnel at Rocky Flats who understand the challenges involved in stabilizing nuclear materials and safely shipping them. (Steward, Golan testimony) Because DOE has never closed a nuclear weapons plant before, and due to the aggressive closure schedule, security planners are engaged in first-time, complex problem solving functions and must focus all of their attention on the clean up project. (Golan, Steward testimony) Martin Anderson, Wackenhut manager of security planning and integration, testified that security planning is critical to the closure project because if safety or security is found deficient in any area, the entire closure project comes to a halt until the deficiency is removed. (Anderson testimony) Mark Hubbell, a security planner for Wackenhut since 1995, testified that as Rocky Flats works toward closure, the security planners have more duties than before because the relocation of all Category 1 and 2 SNM into Building # 371 requires them to reconfigure the entire security system. Further, a vulnerability analysis will be required any time "hold up" [9] is discovered in the former production buildings because this material is outside the protected area. (Steward testimony)

There are two Rocky Flats DOE staff members and approximately ten to twelve contractor employees who perform vulnerability analyses at Rocky Flats. (*Id.*) A vulnerability analyst must have intimate knowledge of the site and of the security measures which are in place in order to develop a scenario to defeat an adversary and protect the target. (*Id.*) Although there are approximately twelve other persons located around the country who could

---

9. "Holdup" is a term used to describe solidified and liquid plutonium deposits which have accumulated in facilities and equipment over the years. (Steward testimony; Govern-

ment's Ex. H. p. 16) Holdup is commonly found in gloveboxes, ventilation ducts, and low spots in process piping, tanks and drains. (*Id.*)

be called in to perform the work, they would have to first familiarize themselves with the Rocky Flats site and that would cause additional delay. (*Id.*)

After reviewing the allegations of the second amended complaint, Golan, Owendoff and Steward concluded that security planners, including vulnerability analysts, who are essential to the closure process would have to be involved in defending the case because relators allege a general failure of security at Rocky Flats for a ten-year period. Stone and Steward testified that because security at Rocky Flats is integrated, one cannot determine whether the facility was at high risk by looking at a single variable; rather, it is necessary to look at all variables to determine what compensatory measures were in place which would have reduced the overall level of risk to the facility. To determine the level of risk present at any given time in the past, a vulnerability analyst would have to recreate the security specifics and validate the security measures in place at that time. (*Id.*)

Relators elicited testimony that several of the security planners whom Steward identified in his Declaration in support of the United States' Motion to Dismiss as critical personnel for the closure process are no longer working at Rocky Flats: one security planner was laid off by the contractors, and others left to find more secure employment because once Rocky Flats is closed, there will be no more jobs at that site.[10] (Anderson, Steward, Hubbell testimony) Further, none of the witnesses for the Government or the defendants could attest that the contractors had designated the security planners as key personnel, or offered them retention packages to stay at Rocky Flats through completion of the closure project. Hubbell testified, however, that when security planners leave Rocky Flats, others have to assume their job responsibilities.

Relators also elicited the following testimony from Steward on cross examination. The vulnerability analysis in a SSSP may show that Rocky Flats is at high risk without implementation of a certain compensatory measure.[11] The DOE approves the SSSP if the contractor implements the specific compensatory measure needed to reduce high risk. If there is evidence that the specific compensatory measure was not implemented, then it would not be necessary to recreate a vulnerability analysis to show whether or not the site was at high risk in the past without the compensatory measure because the vulnerability analysis in the SSSP already made that determination.

Relator Mark Graf opined that security planners would not have to be involved in the litigation of relators' claims, with the exception of the bulk incident claim and alarm system claim. Graf further opined that even though the second amended complaint alleges that the contractors placed security at high risk for one decade, the relators would not have to demonstrate that Rocky Flats was at high risk to prove any of their discrete claims, except for the

---

10. As Rocky Flats moves towards closure, contractor staff is being reduced as contractor functions are eliminated. (Golan testimony)

11. The SSSP is a "snapshot" which represents the security configuration at each DOE site at a particular time. (Stone, Steward testimony) The SSSP is prepared by the contractors and includes a management report and a vulnerability analysis. (Steward testi-mony) The DOE validates and verifies the contents of the SSSP to ensure that it accurately reflects the status of nuclear security at the site. (Steward testimony) The SSSP is the master agreement between the contractor and the DOE. (Anderson testimony) Any exemption from DOE regulations or orders approved by the DOE should be contained in a SSSP. (*Id.*)

general failure of security claim, because high risk is merely the impact of the allegedly false claims for payment.

### 2. *Diversion of management*

There was evidence that the participation of management in the litigation of this case could possibly impact the closure deadline. Golan testified that he spends approximately ten percent of his time in litigation matters and believes, based on his experience with other lawsuits, that discovery, redaction or declassification of classified materials, and meetings with attorneys will divert the contractor managers' focus away from closure. Martin Anderson testified that approximately one year ago, Wackenhut assigned him to gather documents to be disclosed to the relators as part of Wackenhut's initial disclosures because of his knowledge of the factual information relevant to the relators' allegations. Anderson worked full-time for approximately one month gathering relevant unclassified documents, which he estimated to be one-fifth of the unclassified documents which would need to be reviewed.[12] While Anderson was engaged in document review, he was no longer involved in security planning and Wackenhut lost a week of security planning activity. (Anderson testimony) Anderson does not know if the entire closure project was delayed by one week because of his absence, but stated that most of Wackenhut's security planning activities are tied to the critical path.

Anderson opined that, based on his experience in the initial document gathering process, it would take him approximately one year to gather and review all documents which are potentially relevant to the defense of this action. If the discovery process were accelerated by assigning more persons to the task, those persons would not be working on the closure project. (Anderson testimony)

Golan also opined that this litigation will foster an adversarial relationship between DOE and its contractors which will negatively impact the collaborative process and will interfere with the DOE's ability to achieve the 2006 closure date.

### 3. *Review of Classified Documents*

There was some evidence that the review of classified documents for declassification or redaction will divert additional personnel away from the closure project. Rodney Hoffman testified that the forty-seven documents which relators requested in a March 2, 1998 letter from relators' counsel to the DOJ (Relators' Ex. 1) were classified. Hoffman opined that it would take two people, one of whom must be a declassifier, one year to review the documents on the list for declassification and for the mosaic effect of any nonclassified information contained in the documents.[13] Hoffman estimated that it would take approximately 250 hours to redact the classified information from a SSSP. Relator Mark Graf, who is a derivative classifier of protective force operations documents

---

12. Anderson estimated that numerous classified documents are relevant to the security issues raised by the relators in the second amended complaint, but he did not review many of them because no procedures are in place for the production of classified material.

13. Hoffman testified in *Cook v. Rockwell Int'l Corp.*, that he could review forty pages of a classified document in six hours (Hoffman testimony); however, the classified information relevant to the security issues in the *Cook* case was restricted data as opposed to the national security information ("NSI") which forms the bulk of the classified information at issue in this case. (*Id.*) Witnesses for both parties agreed that it is more time-consuming to review an NSI document for declassification because restricted data is easier to identify than NSI data and the rules for declassification of NSI data are not as clear cut. (Hoffman, Graf testimony)

(NSI materials), but is not an authorized declassifier, testified that it takes him an average of one to one and a half minutes to review one page of a document for classification purposes.

When Hoffman initially reviewed documents for declassification in the *Cook* case, he spent one day every other week on the project, but as the litigation progressed and plaintiff's counsel identified other relevant documents, the DOE was required to hire eighty persons to work full time on the project for one-year. (Hoffman testimony) DOE staff redacted more than one million pages of documents during that one-year period. (*Id.*)

Hoffman testified that to find declassifiers today would be difficult because many DOE declassifiers have lost their security clearances. There are currently eight declassifiers at Rocky Flats who work for DOE or the contractors. (Hoffman testimony) According to Hoffman, review of classified documents relevant to this litigation for declassification would require the DOE to pull declassifiers from the contractor classifier program and most of them are involved in the Rocky Flats closure project.

### 4. *Impact to closure budget*

The evidence showed that monies for DOE litigation expenses must come from either the general DOE budget or the special Congressional appropriation for the Rocky Flats closure project. (Owendoff testimony) Hoffman testified that complying with discovery requests in the *Cook* litigation cost the DOE $7 or $8 million.

### b. *Analysis*

The court finds that the Government has sufficiently demonstrated that dismissal of this case will eliminate a possible impediment to the timely closure of Rocky Flats. Admittedly, the evidence on this issue is not concrete because the defendant contractors have not answered the allegations of the second amended complaint and it is not clear which closure project personnel will be needed to participate in the discovery process and in meetings with defense attorneys to defend against the relators' claims; however, the court is persuaded that any diversion of personnel attention away from the closure project would negatively impact the closure schedule. Even if the case could be litigated without the necessity of vulnerability analyses to re-create past security specifics at Rocky Flats, it is a reasonable assumption that any safeguards and security staff who are currently involved in the closure project, and who have personal knowledge of the past events alleged in the second amended complaint, are potential witnesses in this action and may be called upon to locate relevant documents. By the relators' own account, security planners are needed to prove their bulk incident and alarm system claims. Further, Golan's concerns that the defendant contractors and the DOE will be in an adversarial relationship if this lawsuit continues are not unfounded. Relators seek millions of dollars in damages from the contractors. If the contractors are required to defend litigation which could severely impact their financial viability, they will likely devote substantial attention to this lawsuit, possibly at the expense of the DOE's high-priority Rocky Flats closure project. Less persuasive was the Government's evidence that the litigation expenses incurred in this action would be paid with monies needed to effect the timely closure of Rocky Flats. The only evidence on the issue was that the DOE's involvement in this case would be funded from the DOE's general budget or from the special Congressional appropriation fund. The impact of this suit upon the closure project funds is unknown at this time; however, any funds diverted from the closure project to pay for litiga-

tion expenses could potentially have a negative impact on timely closure.

Relators take issue with the Government's failure to confer with them about whether any of the claims asserted in the second amended complaint can be litigated without negatively impacting the closure schedule prior to filing the dismissal motion. Relators contend that dismissal of the entire case is not rationally related to the timely closure of Rocky Flats because some of their claims, such as that relating to the implementation of hardened fighting positions, require them to prove only that DOE paid for security based on the implementation of a particular compensatory measure and that compensatory measure was not implemented by the contractors. Thus, relators argue, litigation of the hardened fighting positions claim would not require vulnerability analysts to recreate past security at Rocky Flats. Relators further maintain that other claims, such as the failure to maintain the mandated training of the protective force, require them to prove only that the contractors failed to comply with certain DOE orders and regulations, but represented otherwise in claims for payment to DOE.

The difficulty with the relators' position is that it takes into account only those witnesses and documents which relators believe are necessary to their litigation strategy. It is not known at this time what evidence will be involved in defending the relators' claims; however, given the nature of the allegations of the Second Amended Complaint, it is probable that defendants will take a "kitchen sink" approach in their defense. The bulk of the second amended complaint alleges that compensatory measures required by the 1994 and 1997 SSSPs to reduce the security risk at Rocky Flats to an acceptable level were not implemented, but the defendants submitted claims for payment to the DOE after expressly or impliedly certify-

ing that such compensatory measures were in place. The relators have alleged that each and every payment made to the contractors by the DOE for security and remediation at Rocky Flats in the 1990's was a false claim for payment because the DOE would not have paid the claims if the DOE had known that the facility was at high risk. It is possible that defendants will defend on the ground that even if a particular compensatory measure was not utilized, other compensatory measures were in place to reduce the level of risk at the site and those measures were acceptable to the DOE. Whether such a defense strategy would be successful is irrelevant, the critical point being that the evidence which defendants might amass to defend against relators' claims could very well be much broader than the evidence which relators believe is necessary to litigate this action.

Further, the two specific claims cited by relators as claims which can be isolated and litigated without impact to the closure project involve training of, and performance testing by, Wackenhut's protective force, areas which are under the direction of Martin Anderson. Anderson will likely be a key witness in the defense of those claims and his involvement in this litigation may result in a delay in the completion of one of the discrete activities of the critical path which will result in a possible delay of the Rocky Flats closure.

Relators also assert that their claims against EG & G, a former contractor, would not delay the closure of Rocky Flats because EG & G is no longer at the site; the evidence shows, however, that former EG & G employees went to work for Kaiser–Hill when EG & G's contract terminated. (Steward testimony) Although there was no evidence about the number of former EG & G employees who are currently involved in the closure project, Martin

Anderson, Wackenhut's current manager of security planning and integration, worked for EG & G as a security system analyst in the early 1990's and provided input for the 1994 SSSP pertaining to performance testing and tactical planning. (Anderson testimony) Anderson is knowledgeable about the issues relevant to relators' claims against EG & G and would probably be involved in EG & G's defense of those claims which would divert his attention from the closure project.

The evidence supports the Government's position that any diversion of contractor or DOE personnel from the closure project to participate in discovery or other litigation defense presents a risk of delay to the closure deadline of December 2006. Even if Rocky Flats does not close on schedule because of other influences unrelated to the instant litigation,[14] that fact does not preclude a finding that dismissal of this action will eliminate one potential cause of delay. The Government engaged in a rational cost/benefit analysis and determined that the potential benefits to be gained by allowing this litigation to go forward are outweighed by the potential risk that the prosecution and defense of this action will divert the attention of managers and other DOE and contractor employees away from the closure project with a resultant delay in closure. The relators have not demonstrated that any of their "discrete claims" can be litigated without adverse impact to the closure project. Because the court finds that the Government has met its burden to establish that dismissal of this action will advance legitimate governmental interests, the burden shifts to the relators to prove that the dismissal is fraudulent, arbitrary and capricious, illegal, or the product of undue influence by the defendants.[15]

B. *Is the Motion to Dismiss illegal, fraudulent, arbitrary and capricious, or the product of improper influence by the defendants?*

Relators advance several arguments in support of their position that the Government's motion to dismiss is arbitrary and capricious, is brought for a fraudulent purpose, or is the product of undue influence by the defendants.

Relators first argue that the motion to dismiss is arbitrary and capricious because the difficulties involving use of classified material, the closure deadline and the available funding were known to the Government when this suit was filed, but the United States did not intervene in, or move to dismiss the action at that time. Although no explanation was given at the hearing as to why the Government waited eight months after the complaint was un-

---

14. A February 2001 General Administration Office ("GAO") Report to Congressional Committees on the progress of the cleanup at Rocky Flats concludes that closure by 2006 is unlikely because of various obstacles faced by the contractors. (Relators' Ex. 39, p. 2). The GAO Report does not mention this litigation as a possible reason for delay in closure.

15. Relators also argue, in their Memorandum in Opposition to United States' Motion to Dismiss, that even if this litigation does impact the closure date, the cost of any delay should be born by the contractors, not the Government, because the contract provides incentives for closure prior to the target date

of 2006 and penalties for delay. The relators' argument is directly refuted by the February 2001 GAO Report which projects that a two-year delay in closure would increase the overall cost of the project by approximately $630 million, requiring the DOE to pay $530 million, with the remainder being the amount of incentive fee Kaiser–Hill would forfeit due to the contractor's failure to meet the closure deadline. (Relators' Ex. 39, p. 19 and n. 22) Further, the evidence showed that any delay of the closure of Rocky Flats will extend the $1 million a day maintenance fees paid by the taxpayers and will prolong the public health and safety risk caused by the continued presence of the Superfund site.

sealed to file the motion to dismiss, the fact that the reasons advanced in support of the dismissal motion were known to the Government during the sealed period does not, by itself, support a finding that the Government's action is arbitrary and capricious. Indeed, each of the alleged *improper* reasons for dismissal advanced by the relators was also known to the Government while the complaint was under seal.

Relators next argue that the Government's decision not to dismiss *Cook v. Rockwell Int'l Corp.*, Civil Action No. 90–K–181, a pending action against EG & G's predecessor at Rocky Flats which involves a large number of classified documents, demonstrates that the asserted reason for dismissal of the instant action is arbitrary and capricious. *See Cook v. Rockwell Int'l Corp.*, 935 F.Supp. 1452, 1458 (D.Colo. 1996). The court is not persuaded by this argument. The Government decides to dismiss qui tam actions on a case-by-case basis. Although a risk of inadvertent disclosure is present in every case involving classified material, the Government does not act arbitrarily by moving to dismiss one of those cases, but not others. The DOJ has made a rational and legitimate policy decision that litigation of the instant action presents an unacceptable risk of inadvertent disclosure of classified materials, which is sufficient.

Relators further argue that a "revolving door of employment" exists between the DOE and its contractors which prevents the DOE from providing effective oversight of the contractors' work at Rocky Flats, and which motivates the DOE to take actions that improperly favor the contractors, such as persuading the DOJ to dismiss this action. There was evidence that several persons who are currently employed by the DOE were formerly employed by one of the contractor defendants, and vice-versa, including Paul Golan who was formerly employed by defendant EG & G. (Owendoff, Golan testimony) There was no evidence, however, that DOE officials persuaded the DOJ to dismiss this action to protect former or current DOE officials' pecuniary interests in current or future employment with the contractors, or that DOE officials colluded with the contractors to seek dismissal of this action. Further, the evidence showed that it is not unusual for persons whose field of expertise is common to both government and private industry to work in both the private and public sectors. For example, relator David Ridenour worked for a DOE contractor in Ohio before he was employed by the DOE at Rocky Flats. (Ridenour testimony) The relators' contention is without merit.

The relators' primary argument is that the motion to dismiss was filed for the fraudulent purpose of shielding the DOE from embarrassment which the agency would suffer if the contractors' alleged security violations, and the asserted lack of appropriate oversight by the DOE, are brought to light. In support of their contention, the relators presented testimony from former DOE officials Colonel Edward McCallum and Peter Stockton, and Ron Timm, a former DOE contractor.

Edward McCallum, former director of Safeguards and Security for the DOE between 1990 and 1999, participated in the validation and verification of SSSPs and rated security at DOE sites. (McCallum testimony) In 1997, Ron Timm, president of RETA Security, Inc., a DOE contractor providing base support for vulnerability analyses for the Office of Safeguards and Security, formed a quality assurance team to analyze the SSSPs at eleven DOE sites, including Rocky Flats. (Timm testimony) Timm's quality assurance team reviewed Rocky Flats security documents and made findings of deficiencies which Timm reported to McCallum. (Timm testimony)

McCallum then reported Timm's findings to the DOE/Rocky Flats field office. (McCallum testimony) Timm visited Rocky Flats in the Summer of 1999 to conduct a quality assurance investigation and discovered some of the same deficiencies which he reported in 1997. (Timm testimony) The deficiencies were then corrected within ninety days. (Timm testimony) Timm and McCallum testified that even though DOE knew about security deficiencies at Rocky Flats in 1997 which were not corrected for two years, DOE officials made public statements during that time that security at Rocky Flats was adequate.

McCallum also testified that relator Peters voiced concerns to him about security at Rocky Flats in 1996–97. McCallum attempted to conduct an on-site investigation, but was prevented from doing so for a one-month period by higher-ranking officials within the DOE. (McCallum testimony) By the time he was allowed to visit the Rocky Flats site, too much time had passed for him to conduct a meaningful investigation. (*Id.*) McCallum reported his concerns about security deficiencies at Rocky Flats to the Secretary of Energy, the Assistant Secretary of Energy, and Congress. (*Id.*) McCallum testified that the Secretary of Energy attempted to prevent him from testifying before a Congressional committee about the security deficiencies at Rocky Flats. McCallum's opinion is that DOE did not provide effective oversight of the contractors during the 1990's. McCallum also testified that the DOE and DOJ never asked him his opinion about the merits of the qui tam suit when the Government was investigating the relators' allegations.

Peter Stockton was the Special Assistant to DOE Secretary Richardson between March 1999 and January 2001. Stockton's duties in that capacity included evaluating the physical security at Rocky Flats and other weapons manufacturing facilities. (Stockton testimony) At the direction of Secretary Richardson, Stockton sent a quality assurance team to Rocky Flats to investigate the status of security there, during the Summer of 1999. (*Id.*) Security deficiencies were discovered during the course of the investigation. (*Id.*) When Stockton advised DOE/Rocky Flats field office personnel of the deficiency findings, the field office acknowledged some of the noted deficiencies, but denied others. (*Id.*) A few weeks later, Colonel Habiger, the DOE's head of safeguards and securities, visited Rocky Flats, but the field office staff did not apprise Habiger of the security violations which had been found by the quality assurance team a few weeks earlier. (*Id.*) Stockton testified that neither the DOE general counsel, nor the DOJ, interviewed him before filing the motion to dismiss.

Timm wrote a letter to General Habiger, dated January 5, 2000, with which Stockton concurred, claiming that certain DOE officials had lied in reporting the actual status of security at Rocky Flats and other DOE sites, and that he and other persons on his quality assurance team had been retaliated against by the DOE for reporting security deficiencies. (Relators' Ex. 11; Timm testimony) Upon receipt of Timm's letter, General Habiger ordered the DOE Inspector General to investigate Timm's allegations. (Timm testimony) The Inspector General conducted an investigation and issued a Summary Report on Allegations Concerning the Department of Energy's Site Safeguards and Security Planning Process on September 28, 2000. (Government's Ex. Z) The Summary Report stated that the inspection findings did not support Timm's allegations that DOE officials lied in reporting the actual status of security at DOE's nuclear sites, or that persons who assisted Stockton suffered retaliation for their role in reviewing SSSPs. (*Id.* at pp. 2, 4 and 5) The inspection team

did find substantial differences between what Timm's quality assurance team reported as the actual status of security at the DOE sites and what the DOE sites had reported, and bitter disagreements between DOE field offices and headquarters over the interpretation of fundamental issues underlying the basis of the SSSP such as the design basis threat, adversary capabilities and the assumptions related to worst case scenarios. (*Id.* at p. 2) The inspection team attributed the problems to the manner in which SSSPs were reviewed during the period referred to in Timm's allegations. (*Id.* at pp. 2–3) The inspection team recommended a restructuring of the SSSP process in order to involve both DOE field office and headquarters personnel in the SSSP from the outset, thereby eliminating the need for a " 'post facto' QA function." (*Id.* at pp. 3–4)

Timm and Stockton disagreed with the findings of the Inspector General's Summary Report, while General Habiger concurred with the Report. (Timm, Stockton testimony) On February 9, 2001, after the IG report was issued, Timm wrote a letter to President Bush's appointee, Secretary of Energy Abraham, raising his concerns about security deficiencies at Rocky Flats. (Timm testimony; Relators' Ex. 11) Timm received a response from Glenn Podonsky, Director of the DOE Office of Independent Oversight, which was one of the groups Timm had accused of misrepresenting the status of security in his January 2000 letter to General Habiger. (Timm testimony; Government's Ex. AA) Podonsky disagreed with Timm's position that SNM at DOE sites was at undue risk and stated that the quality assurance process in which Timm participated "suffered from low credibility among many security professionals in the Department and that some of the tools and techniques [Timm] employed are considered inappropriate or improperly applied to the SSSP quality as-

surance process." (Government's Ex. AA, Attachment, p. 1)

The relators argue that certain officials in the DOE have consistently attempted to cover up security violations at Rocky Flats and that the dismissal of this lawsuit is a part of that cover up. Relators maintain that the DOE, a client of the DOJ, misled the DOJ about the merits of the relators' allegations in the Second Amended Complaint during the DOJ's investigation of relators' claims, causing the DOJ to make a misinformed decision to dismiss this action. Relators emphasize that because McCallum was the DOE director of Safeguards and Security between 1990 and 1999, and Stockton was a special assistant to Secretary Richardson during the time the DOJ investigated the relators' allegations, the DOJ's failure to interview those individuals prior to filing the motion to dismiss demonstrates that certain officials in the DOE were able to prevent the DOJ from consulting with the persons most knowledgeable about security at Rocky Flats.

The evidence does not support the cover up alleged by relators. The evidence was that three individuals involved in the validation and verification of SSSPs reported security deficiencies at Rocky Flats in 1997 and 1999 which were either not corrected or were corrected in a dilatory fashion, while at the same time, the DOE was making public statements that security at Rocky Flats was adequate. The evidence also showed, however, that some DOE officials disagreed with the opinions of McCallum, Stockton and Timm. Clearly, there was disagreement between the DOE site offices, DOE headquarters, and the independent oversight offices about the status of security at Rocky Flats during the mid to late 1990's; however, a disagreement does not prove a cover up.

The evidence further shows that McCallum, Stockton and Timm reported the alleged security deficiencies to various groups within the DOE, to Congress and to the press. Timm's allegations were not covered up, but were investigated by the Inspector General. The fact that Timm and Stockton disagreed with the results of that investigation does not prove a cover up.

Relators provided no evidence that the DOE influenced the DOJ's decision to dismiss this action so that the DOE could avoid possible embarrassment over allegedly ineffective oversight of security at Rocky Flats. Even though the DOJ consulted with DOE officials, such as Paul Golan, about the dismissal of this action, there was no evidence that the DOJ did not exercise its independent judgment in deciding to file the dismissal motion. Further, there was no evidence that the defendant contractors unduly or improperly influenced the decision to file the motion to dismiss. The only evidence on the issue was Paul Golan's testimony that no agents or employees of the defendants were present at any of his meetings with DOE general counsel or DOJ attorneys to discuss dismissal of this action.

The court further finds that the relators presented no persuasive evidence to support their assertions that the DOE uses classification as an excuse to prevent embarrassing information from being disclosed to the public. Additionally, there was no evidence that the dismissal motion was the product of bribery, extortion or coercion by the defendants.

The relators have failed to demonstrate that the United States' Motion to Dismiss is illegal, arbitrary and capricious, brought for a fraudulent purpose, or is the product of undue influence by the defendants.

Finally, the court addresses two policy issues raised by the relators. First, relators contend that by dismissing this action, the Government is sending a message that its contractors can defraud the Government with impunity. Second, relators maintain that if the Government is allowed to dismiss a qui tam case at any point in the litigation just because classified information is involved, or because litigation of the case will interfere with the contractors' work, private enforcement actions under the False Claims Act will be quelled, contrary to the intent of Congress in enacting the qui tam provisions as an important tool to combat fraud.

Remediation of fraud in government contracts is important to both federal agencies and the taxpayers, as evidenced by Congressional enactment of the qui tam provisions to combat such fraud. Notwithstanding, the Government, not the relators, is the real-party-in-interest in a qui tam action. The Government successfully argued that the DOJ made a rational policy choice that the potential recovery of millions of dollars in damages against the defendants in this action is outweighed by the Government's greater interests in the timely closure of Rocky Flats and protection of national security. There was no evidence to show that the DOJ engages in a regular practice of dismissing qui tam actions after the initial intervention period has passed. The private enforcement of False Claims Act cases benefits the Government by allowing the Government to recover the lions share of any monetary remedy realized, while private citizens expend the resources to prosecute the litigation. Despite the benefits which qui tam actions confer on the Government and the public, there are instances when those benefits are outweighed by other legitimate governmental interests. A Government decision to dismiss a qui tam action to serve a greater public interest is appropriate as long as dismissal advances the legitimate governmental interests articulated by the Government, and the dismissal is

not otherwise illegal, arbitrary and capricious, fraudulent, or the product of undue influence by the defendants.

Because the United States has satisfied its burden under *Sequoia Orange* to show that dismissal of this action will advance the legitimate governmental interests in protection of the national security and the timely closure of Rocky Flats, and the relators have failed to satisfy their burden to demonstrate that dismissal is illegal, arbitrary and capricious, fraudulent, or the product of undue influence by the defendants, the court recommends that Counts One and Two of the Second Amended Complaint be dismissed.

### III.

For the reasons set forth herein, it is

RECOMMENDED that the United States' Motion to Dismiss [filed August 21, 2000] be GRANTED. It is

RECOMMENDED that Counts One and Two of the Second Amended Complaint be DISMISSED WITH PREJUDICE. It is

FURTHER RECOMMENDED that defendants be ordered to file an Answer or responsive pleading to Count Three of the Second Amended Complaint, for unlawful retaliation under 31 U.S.C. § 3730(h), within twenty (20) days after the District Judge enters an order on the instant Recommendation.

**Within ten days after being served with a copy of the proposed findings and recommendation, any party may serve and file written objections to the proposed findings and recommendation with the Clerk of the United States District Court for the District of Colorado. The district court judge shall make a de novo determination of those portions of the proposed findings or specified recommendation to which objection is made. The district court judge may accept, reject, or modify, in whole or in** part, **the proposed findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.**

**Failure to make timely objections to the magistrate judge's recommendation may result in a waiver of the right to appeal from a judgment of the district court based on the findings and recommendations of the magistrate judge.**

Dated: August 7, 2001.