INTERNATIONAL GAME TECHNOLOGY, INC., A Nevada Corporation; ANCHOR COIN, INC., A Nevada Corporation; SPIN FOR CASH WIDE AREA PROGRESSIVE, A Nevada Partnership; AND STATE OF NEVADA, OFFICE OF THE ATTORNEY GENERAL, Petitioners, v. THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, IN AND FOR THE COUNTY OF WASHOE, AND THE HONORABLE PETER I. BREEN, District Judge, Respondents, and STATE OF NEVADA EX REL. JAMES McANDREWS, Real Party in Interest.

No. 43882

STATE OF NEVADA, OFFICE OF THE ATTORNEY GENERAL; AMAZON.COM, INC.; BORDERS GROUP, INC.; BORDERS ONLINE, INC.; TOYS "R" US, INC.; TOYSRUS.COM, INC.; TARGET CORPORATION; TARGET DIRECT, LLC; WAL-MART STORES, INC.; WAL-MART.COM, INC.; PACIFIC SUNWEAR OF CALIFORNIA, INC.; SHOP PACSUN.COM, INC.; RETAIL BRAND ALLIANCE, A Delaware Corporation, DBA CASUAL CORNER GROUP; CASUAL CORNER GROUP.COM, LLC, A Delaware Corporation; PETSMART, INC., A Delaware Corporation; PETSMART.COM, INC., A Corporation; AND PETSMART DIRECT, INC., A Corporation, Petitioners, v. THE EIGHTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA, IN AND FOR THE COUNTY OF CLARK, AND THE HONORABLE VALORIE J. VEGA, District Judge, Respondents, and STATE OF NEVADA EX REL. BEELER, SCHAD & DIAMOND, P.C., Real Party in Interest.

No. 43953

February 9, 2006                    127 P.3d 1088

*George Chanos*, Attorney General, and *Gregory L. Zunino*, Senior Deputy Attorney General, Carson City, for Petitioner Attorney General.

*Jones Vargas* and *John P. Desmond* and *Ryan W. Herrick*, Reno, for Petitioners International Game Technology, Anchor Coin, and Spin For Cash Wide Area Progressive.

*Fred Hill Atcheson*, Reno; *John S. Bartlett*, Carson City; *Mark L. Mausert*, Reno, for Real Party in Interest McAndrews.

*Hunterton & Associates* and *Terry J. Care*, Las Vegas, for Petitioners Toys ''R'' Us; Toysrus.com; Retail Brand Alliance, d/b/a Casual Corner Group; Casual Corner Group.com; Petsmart; Petsmart.com; and Petsmart Direct.

*Jones Vargas* and *Gary R. Goodheart* and *Tamara Beatty Peterson*, Las Vegas, for Petitioners Wal-Mart Stores, Wal-mart.com, Target Corporation, Target Direct, Pacific Sunwear of California and Shop PacSun.com.

*Lionel Sawyer & Collins* and *Sarah E. Harmon, Dennis L. Kennedy* and *Dan R. Reaser*, Las Vegas, for Petitioners Amazon.com, Borders Group, and Borders Online.

*Jolley Urga Wirth Woodbury & Standish* and *William R. Urga*, Las Vegas, for Real Party in Interest Beeler, Schad & Diamond, P.C.

*McDonald Carano Wilson LLP* and *Jeffrey A. Silvestri*, Las Vegas, for Amicus Curiae Nevada Taxpayers' Association.

## OPINION

By the Court, BECKER, J.:

These consolidated petitions for extraordinary relief challenge the district courts' refusals to dismiss actions brought under Nevada's False Claims Act (FCA) and present issues of first im-

pression in Nevada. Petitioners assert that the district courts wrongfully applied the "good cause" standard by which the Attorney General may move to dismiss false claims actions instigated by private persons on behalf of the state, because these actions are based on complex issues of tax liabilities and thus are improperly maintained under the FCA.

We conclude that, while private plaintiffs may properly bring false claims actions based on tax deficiencies under some circumstances, state law entrusts the primary responsibility for making factual evaluations under, and legal interpretations of, the revenue statutes to the expertise of Nevada's Department of Taxation. Accordingly, the Attorney General's assertion that an FCA action implicates issues that are better left, initially, to the tax department's expertise constitutes a basis for good cause dismissal. As no party demonstrated that the Attorney General acted improperly in moving to dismiss the underlying actions, the district courts manifestly abused their discretion when they refused to dismiss the underlying tax-based false claims actions for good cause.

## FACTS AND PROCEDURAL HISTORIES

To expose and combat attempted fraud against the government, Nevada passed legislation in 1999 encouraging private citizens to come forward with information of wrongful claims for governmental funds.[1] Nevada's FCA, codified at NRS Chapter 357, permits persons to become "private attorneys general,"[2] granting them the right and financial incentive to sue on behalf of the state and its political subdivisions "if money, property or services provided by the State [or its political subdivisions] are involved."[3] A private plaintiff who files a false claims action on behalf of himself and the state or political subdivision is referred to as a qui tam plaintiff.[4] Under the FCA, the qui tam plaintiff is entitled to whistleblower

---

[1]*See* Hearing on S.B. 418 Before the Assembly Government Affairs Comm., 70th Leg. (Nev., May 5, 1999); Hearing on S.B. 418 Before the Senate Government Affairs Comm., 70th Leg. (Nev., March 31, 1999).

[2]*See* Hearing on S.B. 418 Before the Assembly Government Affairs Comm., 70th Leg. (Nev., May 5, 1999).

[3]NRS 357.080(1). The FCA also governs false claims actions instituted by the Attorney General. NRS 357.070.

[4]*See Black's Law Dictionary* 1251 (6th ed. 1990) (explaining that "qui tam" is short for " 'qui tam pro domino rege quam pro si ipso in hac parte sequitur,' meaning 'Who sues on behalf of the King as well as for himself' "); *U.S. ex rel. Ridenour v. Kaiser-Hill Co., L.L.C.*, 174 F. Supp. 2d 1147, 1151 n.2 (D. Colo. 2001) (explaining the federal FCA's status as a qui tam law), *aff'd*, 397 F.3d 925 (10th Cir. 2005).

protections and between 15 and 50 percent of any recovery,[5] the remainder of which goes into the State General Fund.[6]

When the qui tam plaintiff files an action, he or she must send a copy of the complaint and written disclosure of all material information to the Attorney General.[7] The complaint is then sealed until the Attorney General decides whether to intervene;[8] the defendants are not served until the complaint is unsealed.[9] If the Attorney General decides to intervene "and proceed with the action," the private plaintiff must cede control of the litigation[10] but nevertheless remains a party to the action.[11] But if the Attorney General initially decides not to intervene, the private plaintiff may proceed alone, with the same rights as the Attorney General would have had.[12] The Attorney General may later intervene only upon timely application and "if the interest of the State . . . in recovery of the money or property involved is not being adequately represented by the private plaintiff."[13] The Attorney General also has authority to settle the action and "may move to dismiss the action for good cause."[14] Generally, a false claims action may not be maintained if administrative or court proceedings involving the same underlying facts and allegations were previously instigated.[15]

### Docket No. 43882 (McAndrews)

In February 2003, on behalf of himself and the State of Nevada, real party in interest James McAndrews filed suit under the FCA against petitioners International Game Technology, Anchor Coin, Inc., and Spin For Cash Wide Area Progressive (collectively, IGT). In his complaint, McAndrews alleged that IGT falsified tax records in order to conceal or decrease the amount of sales and use tax it owed the State. Specifically, McAndrews asserted that while em-

---

[5]NRS 357.210; NRS 357.240; NRS 357.250.

[6]NRS 357.230.

[7]NRS 357.080(5).

[8]NRS 357.080(4); *see also* NRS 357.110(1) (providing that the Attorney General must decide whether to intervene, or move to extend the time for his election, within 120 days of receiving the complaint and disclosure).

[9]NRS 357.080(4).

[10]NRS 357.110(1); *see also Swift v. U.S.*, 318 F.3d 250, 251 (D.C. Cir. 2003) (interpreting the federal FCA term "proceed with the action" as "go forward with the government running the litigation").

[11]NRS 357.120(1).

[12]NRS 357.110(2); NRS 357.130(1).

[13]NRS 357.130(2).

[14]NRS 357.120(2), (3).

[15]NRS 357.080(2), (3)(b).

ployed at IGT, where he was involved with tax compliance matters, he discovered IGT's involvement in numerous tax-evasion schemes. For example, according to McAndrews, International Game Technology and Anchor Coin had engaged in unreported or under-reported retail sales to a nonregistered joint venture entity, Spin For Cash, and had failed to charge and remit taxes on various retail leases of gaming machines, parts and components in Nevada. McAndrews also alleged that IGT had intentionally failed to "charge, collect or remit" sales taxes due on revenues received from the licensing of gaming software used on poker machines sold within Nevada.

When Nevada's Attorney General received a copy of McAndrews' FCA complaint, under seal, he asked the Nevada Department of Taxation (tax department) to conduct an audit of IGT. After having been granted an extension of time, the Attorney General elected to intervene in McAndrews' action.

Thereafter, the Attorney General moved to dismiss the false claims action. In his motion, the Attorney General argued that the action should be dismissed because (1) the FCA does not apply to tax matters; (2) the administrative tax-collection process, as set forth in NRS Title 32, in effect preempts privately litigated false claims actions based on tax deficiencies; and (3) good cause exists to dismiss the action. In support of the third reason for dismissal, the Attorney General pointed out that the Legislature has demanded that the tax statutes be interpreted and applied in a uniform and consistent manner; accordingly, he noted, the tax department has been granted original authority to execute the state's tax laws. The Attorney General further pointed out that, as a result, the courts generally give deference to the factual and interpretive determinations made within the tax department's authority. He then reasoned that the false claims action should be dismissed because the tax department, which was working toward, but had not yet made, a determination in this matter, should have the initial opportunity to address the issues necessarily implicated in resolving McAndrews' complaint, in order to maintain the uniformity and consistency that is required under the tax laws.

IGT joined the Attorney General's motion, raising similar arguments, and also separately moved to dismiss for failure to state a claim. In so doing, IGT denied that it had failed to pay any taxes due, as McAndrews had alleged, and pointed out that McAndrews' action presented complex issues of taxation involving intellectual property, royalties, and mergers and acquisitions. IGT observed that the complaint indicated that McAndrews simply interpreted the revenue laws differently than IGT.

The district court denied the motions to dismiss, concluding that the express language of Nevada's FCA does not bar tax deficiency

claims and that the Attorney General had not demonstrated any "legitimate governmental purpose" served by dismissal and had therefore failed to demonstrate good cause for dismissal. The court, expressing concern over the impact that any dismissal would have on McAndrews' interests and the FCA's purpose to encourage private persons to come forward with information of fraud, rejected IGT's additional arguments and refused to dismiss the action. Consequently, IGT filed the instant petition for a writ of mandamus, challenging the district court's refusal to dismiss the false claims action. The Attorney General filed a joinder to the petition. McAndrews filed answers in response to both parties' challenges,[16] and the Nevada Taxpayers' Association was permitted to file an amicus curiae brief.

*Docket No. 43953 (Beeler, Schad & Diamond)*

The issues underlying the petition in Docket No. 43953 arise from eleven separate false claims actions filed by the Chicago-based law firm and real party in interest Beeler, Schad & Diamond, P.C. Like McAndrews' complaint, the complaints in this matter were filed on behalf of the state and premised upon allegations of Nevada sales and use tax deficiencies. Essentially, Beeler, Schad & Diamond alleged that several retailers who maintain stores or warehouses in Nevada, including Amazon.com, Borders, Toys "R" Us, Target, Pacific Sunwear, Wal-Mart, Casual Corner, and Petsmart (collectively, retailers), all of which filed a collective joinder to the petition,[17] are liable to the State for reporting falsified tax liabilities in connection with the retailers' Internet and/or catalog sales.

After receiving the complaints under seal, the Attorney General initially declined to intervene in the false claims actions. Nonetheless, the Attorney General later moved to intervene for the limited purpose of settling or filing a motion to dismiss the actions. The court determined that the Attorney General had demonstrated that his intervention would benefit the state's interests and granted the motion to intervene. The Attorney General then moved to dismiss

---

[16]McAndrews' answer to IGT's petition challenges IGT's standing to seek writ relief based on the district court's refusal to grant the Attorney General's motion, since NRS 357.120 grants authority only to the Attorney General to move to dismiss a false claims action. As the Attorney General has since joined the petition, and as it is IGT that will be affected if the district court proceeds with the FCA action and IGT's taxpayer rights that will assertedly be impinged, the proper parties have sought extraordinary relief in this instance. *See* NRS 34.170.

[17]Beeler, Schad & Diamond also filed FCA actions against Hallmark, Mothers Work, KB Toys, Jo-Ann Stores, and Ritz Camera, but those entities are not parties to these writ proceedings.

the Beeler, Schad & Diamond actions, for reasons similar to those propounded in the McAndrews action.

The district court denied the Attorney General's motion to dismiss, summarily concluding that tax deficiency claims may properly be brought under Nevada's FCA and that the Attorney General had not demonstrated good cause to dismiss the actions. Subsequently, the Attorney General filed the instant petition for a writ of mandamus or prohibition, challenging the district court's refusal to dismiss the false claims actions. The retailers filed a joinder to the petition, to which Beeler, Schad & Diamond filed an answer, and the Nevada Taxpayers' Association was permitted to file an amicus curiae brief.

## DISCUSSION

A writ of mandamus is available to compel the performance of an act that the law requires as a duty resulting from an office, trust or station,[18] or to control an arbitrary or capricious exercise of discretion,[19] and is appropriate when the district court manifestly abuses its discretion by improperly refusing to dismiss an action.[20] A writ of prohibition is the counterpart to a writ of mandamus and is available when a district court acts without or in excess of its jurisdiction.[21]

[Headnote 4]

Generally, this court declines to consider writ petitions that challenge district court orders denying motions to dismiss.[22] Even so, this court may exercise its discretion to consider such writ petitions when the district court is obligated to dismiss an action pursuant to clear authority under a statute or rule or when an important issue of law needs clarification and this court's review would serve considerations of public policy or sound judicial economy and administration.[23]

As the parties suggest, these petitions raise important issues of law in need of clarification, involving significant public policy

---

[18]NRS 34.160; *see also Smith v. District Court*, 107 Nev. 674, 818 P.2d 849 (1991).

[19]*Round Hill Gen. Imp. Dist. v. Newman*, 97 Nev. 601, 637 P.2d 534 (1981).

[20]*See Desert Fireplaces Plus, Inc. v. Dist. Ct.*, 120 Nev. 632, 635-36, 97 P.3d 607, 609 (2004).

[21]*State of Nevada v. Dist. Ct. (Anzalone)*, 118 Nev. 140, 146-47, 42 P.3d 233, 237 (2002); NRS 34.320.

[22]*Beazer Homes Nevada, Inc. v. Dist. Ct.*, 120 Nev. 575, 578-79, 97 P.3d 1132, 1134 (2004).

[23]*Id.* at 579, 97 P.3d at 1134; *Dayside Inc. v. Dist. Ct.*, 119 Nev. 404, 407, 75 P.3d 384, 386 (2003).

concerns, of which this court's review would promote sound judicial economy. Accordingly, we exercise our discretion to consider petitioners' arguments.

*Motions to dismiss*

*Timing*

Initially, we note that when the Attorney General moved to dismiss the McAndrews and Beeler, Shad & Diamond false claims actions, the cases were at slightly different procedural junctures: in the McAndrews action, the Attorney General intervened under NRS 357.080(4), acquired control over the litigation, and then moved to dismiss, but in the Beeler, Schad & Diamond actions, the Attorney General moved to dismiss only after initially declining to intervene, remitting his rights in conducting the actions to the private plaintiff, and then subsequently intervening under NRS 357.130(2). As a result, Beeler, Schad & Diamond asserts that it retained primary control over the litigation and that the Attorney General had no authority to move to dismiss the false claims actions, since he was allowed to subsequently intervene, statutorily, only in order to correct a failure to adequately represent the State in further proceedings.

NRS 357.120 provides, in pertinent part, that the private plaintiff remains a party to the action once the Attorney General intervenes under NRS 357.080(4) and that the Attorney General may move to dismiss the action for good cause:

> **Effect of intervention of Attorney General in action by private plaintiff; motion to dismiss; settlement.**
>
> 1.   If the Attorney General intervenes, the private plaintiff remains a party to an action pursuant to NRS 357.080.
>
> 2.   The Attorney General may move to dismiss the action for good cause. The private plaintiff must be notified of the filing of the motion and is entitled to oppose it and present evidence at the hearing.

In contrast, NRS 357.130 provides that if the Attorney General initially declines to intervene, he may later intervene in the action if the private plaintiff is not adequately representing the state's interest:

> **Effect of declination of Attorney General to intervene in action by private plaintiff; authority for and effect of election by Attorney General to intervene subsequently in such action.**
>
> 1.   If the Attorney General elects not to intervene in an action pursuant to NRS 357.080, the private plaintiff has the

same rights in conducting the action as the Attorney General would have had. A copy of each pleading or other paper filed in the action, and a copy of the transcript of each deposition taken, must be mailed to the Attorney General if the Attorney General so requests and pays the cost thereof.

2. Upon timely application, the Attorney General may intervene in an action in which he has previously declined to intervene, if the interest of the State or a political subdivision in recovery of the money or property involved is not being adequately represented by the private plaintiff.

3. If the Attorney General so intervenes, the private plaintiff retains primary responsibility for conducting the action and any recovery must be apportioned as if the Attorney General had not intervened.

Beeler, Schad & Diamond argues that these two statutes' different treatment of false claims actions, depending upon the time of intervention, indicates that the Attorney General has no authority to move to dismiss for good cause unless he decides to intervene initially. In making this argument, Beeler, Schad & Diamond cites no outside authority in support of its interpretation, but rather bases its conclusions on rules of statutory construction, noting that "statutes must be construed to give meaning to all of their parts and language within the context of the purpose of the legislation."[24] Because NRS 357.130(2) permits subsequent intervention only if "the interest of the State . . . in recovery of the money or property involved is not being adequately represented by the private plaintiff," Beeler, Schad & Diamond argues that this statute only allows the Attorney General to intervene in order to proceed with the litigation, not to end it. And because NRS 357.130(1) also gives primary responsibility for conducting the litigation to the private plaintiff and, unlike NRS 357.120, does not mention that the Attorney General may move to dismiss, the law firm reasons that the Attorney General may not do so upon subsequent intervention.

Despite the apparent limitation reflected in NRS 357.130, however, NRS 357.120(2)'s dismissal provision must be read more independently than Beeler, Schad & Diamond advocates. First, we note that NRS 357.120's title merely reflects the separate contents of the statute's three subsections.[25] While reviewing subsections of a statute together can help determine the meaning and purpose of a statute,[26] neither NRS 357.120 nor NRS 357.130 provides that the Attorney General may move to dismiss an action only after he has initially intervened.

[24]*Banegas v. SIIS*, 117 Nev. 222, 229, 19 P.3d 245, 250 (2001).

[25]*See Coast Hotels v. State, Labor Comm'n*, 117 Nev. 835, 841-42, 34 P.3d 546, 551 (2001).

[26]*Diamond v. Swick*, 117 Nev. 671, 676, 28 P.3d 1087, 1090 (2001).

As noted by Beeler, Schad & Diamond, the statutes and their subsections must be read to render meaning to the legislation's purpose.[27] Federal courts have read similar language in the federal FCA, albeit contained in one section without separate headings,[28] as permitting the government not only to move to dismiss an action after initially declining to intervene but also to move to dismiss an action without intervening at all.[29] As recognized by those courts, qui tam actions are permissible only to the extent that they can be construed in a manner so as to leave inviolate the doctrine preventing the separate executive, legislative, and judicial powers from infringing on one another. Because the executive branch is charged with "tak[ing] Care that the Laws be faithfully executed,"[30] Congress's grant of authority to private persons to also act on behalf of the United States must be limited in a way that does not overly interfere with the executive branch's authority.[31] As a result, the courts have determined that "to condition the Government's right to move to dismiss an action in which it did not initially intervene . . . would place the [federal] FCA on constitutionally unsteady ground," since the separation of powers doctrine remains undisturbed by the FCA only "as long as it is interpreted as vesting in the Executive Branch sufficient control over *qui tam* actions."[32]

---

[27]*Id.*

[28]31 U.S.C. § 3730(c) (2000) provides, in relevant part:

RIGHTS OF THE PARTIES TO QUI TAM ACTIONS—(1) If the Government proceeds with the action, it shall have the primary responsibility for prosecuting the action . . . .

(2)(A) The Government may dismiss the action . . . .

. . . .

(3) If the Government elects not to proceed with the action, the person who initiated the action shall have the right to conduct the action. If the Government so requests, it shall be served with copies of all pleadings filed in the action and shall be supplied with copies of all deposition transcripts (at the Government's expense). When a person proceeds with the action, the court, without limiting the status and rights of the person initiating the action, may nevertheless permit the Government to intervene at a later date upon a showing of good cause.

[29]*Ridenour v. Kaiser-Hill Co., L.L.C.*, 397 F.3d 925, 932, 933 n.13 (10th Cir. 2005) (noting that the question of whether the government must first intervene "is largely academic," as the court would merely construe a motion to dismiss as a motion to intervene and dismiss); *accord Swift v. U.S.*, 318 F.3d 250, 251-52 (D.C. Cir. 2003).

[30]U.S. Const. art. II, § 3.

[31]*See Ridenour*, 397 F.3d at 934; *see also Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749 (5th Cir. 2001); *U.S. ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 749-57 (9th Cir. 1993).

[32]*Ridenour*, 397 F.3d at 934; *see also Riley*, 252 F.3d 749.

As the same constitutional concerns arise within Nevada's FCA scheme,[33] the statutes may not be construed as prohibiting the Attorney General from moving to dismiss after he subsequently intervenes.[34] Even after intervention, any subsequent motion to dismiss the action for good cause necessarily implicates the State's interests and the executive branch's prosecutorial discretion.[35] Therefore, the district court properly considered the Attorney General's motion to dismiss in the Beeler, Schad & Diamond matter even after permitting him to subsequently intervene under NRS 357.130(2).[36]

### "Good cause" standards

Once filed, the Attorney General may dismiss a privately instigated false claims action only with leave of the court and "for good cause."[37] The private plaintiff must be notified of the Attorney General's motion to dismiss and be given an opportunity to oppose it and to present evidence at the hearing.[38] With the imposition of a good cause standard and notice and opportunity to oppose

---

[33]*See* Nev. Const. art. 3, § 1(1) (mandating the separation of powers between the executive, legislative, and judicial branches of government); *id.* art. 5, §§ 19, 22 (providing for the election of the Attorney General as part of the executive branch, with duties as are prescribed by law); NRS 227.230(1) (providing for the State Controller to direct the Attorney General to prosecute, "in the name of the State, all proper suits for the recovery of any debts, money or property of the State").

[34]*See Banegas,* 117 Nev. at 227, 19 P.3d at 249 ("We decline to assume the Legislature intended a construction of [a] statute that would compromise its constitutionality.").

[35]According to Beeler, Schad & Diamond, the Attorney General "prematurely" moved to dismiss before he was a party to the litigation in that action; apparently, the district court determined that the Attorney General was first required to intervene before raising "any meritorious arguments regarding the actions."

[36]To the extent that federal court precedent suggests that the standard for dismissal is tied to the procedural posture of the action, those concerns are inapplicable here. Some federal courts have indicated that, if the government moves to dismiss before the complaint is unsealed, the court might be required to give the government more deference than it would if the government had moved to dismiss after the complaint had been unsealed and the defendants served with a copy. *See Swift,* 318 F.3d 252 (concluding that, at least when the complaint remains sealed, the government's right to dismiss an action, like its decisions not to prosecute, is "unfettered" and "unreviewable"); *Ridenour,* 397 F.3d at 935 (discussing *Swift* in light of various procedural postures). In this case, the complaints had been unsealed in both actions before the Attorney General moved to dismiss. As a result, those concerns are not implicated here, and the same level of review should be given to the Attorney General's motions in both actions.

[37]NRS 357.120(2).

[38]*Id.*

requirements, two potentially competing concerns are reconciled: the important public policy underlying the FCA's objective to encourage private persons to "blow the whistle," by granting them monetary incentives and certain protections against retaliation in exchange for exposing fraud against the government, is balanced against the constitutional concerns implicated when a private party is allowed to conduct actions on behalf of the State, an act usually reserved to the executive branch.[39] Thus, the Attorney General can move to dismiss a false claims action at any point in the litigation, but, to prevent a private plaintiff from being denied the possibility of receiving an award for his efforts for improper reasons, the Attorney General must have a good cause basis for dismissal.

This court has not addressed good cause dismissal situations arising under the FCA. In *Laraway v. Sutro & Co., Inc.*,[40] however, a California Court of Appeal examined a "good cause for dismissal" requirement under California's FCA, similar to the standard at issue here.[41] The California appellate court based its analysis, in part, on the Ninth Circuit's interpretation of the federal dismissal provision in *United States v. Baird-Neece Packing Corp. (Sequoia)*,[42] despite the federal provision's lack of any "good cause" language.[43]

In *Sequoia*, the Ninth Circuit recognized that the government's ability to dismiss a false claims action is broad but not unrestricted, noting that a private plaintiff in a federal false claims action must be afforded notice of the government's motion and an opportunity for a hearing before the action is dismissed.[44] The

---

[39]*Cf.* NRS 357.080(1) (recognizing the two forces at play in the FCA by providing that, even when the Attorney General's prosecutorial discretion is not involved, a court must take into consideration the FCA's purposes and the best interests of the parties before dismissing a privately instigated false claims action); *ACS v. Allied Mold & Die, Inc.*, 114 Cal. Rptr. 2d 773, 777 (Ct. App. 2001) (recognizing that "[d]ifferent considerations come into play when a decision to dismiss is made by a public prosecutor, who is charged with doing justice to all involved").

[40]116 Cal. Rptr. 2d 823 (Ct. App. 2002).

[41]*See* Cal. Gov't Code § 12652(e)(2)(A) (West 2005) (providing that dismissal of a false claims action may be sought "for good cause notwithstanding the objections of the qui tam plaintiff").

[42]151 F.3d 1139 (9th Cir. 1998) (allowing the government to dismiss a federal false claims action even though the action had merit).

[43]*Laraway*, 116 Cal. Rptr. 2d at 830; *see* 31 U.S.C. § 3730(c)(2)(A) ("The Government may dismiss the action notwithstanding the objections of the person initiating the action if the person has been notified by the Government of the filing of the motion and the court has provided the person with an opportunity for a hearing on the motion.").

[44]151 F.3d at 1144. The Tenth Circuit has interpreted this language as requiring a hearing only "if relators can show a 'substantial and particularized

court then examined the parties' relative positions in false claims actions and the legislative intent regarding the federal FCA provision.[45] Noting that the government's dismissal of false claims actions has been likened to its prosecutorial discretion to enforce federal laws, the Ninth Circuit concluded that a substantive due process analysis must be applied by the courts to determine whether an action may be dismissed: the government's reasons for dismissal must be rationally related to a valid government purpose.[46] If the government satisfies that requirement, the burden is shifted to the private plaintiff " 'to demonstrate that dismissal is fraudulent, arbitrary and capricious, or illegal.' " [47] If the plaintiff fails to do so, the court must dismiss the false claims action, whether or not it has merit. The Ninth Circuit noted in *Sequoia* that this standard upholds the separation of powers doctrine, rejecting the suggestion that the judiciary's authority to approve or reject the dismissal of false claims actions impermissibly interferes with the executive branch's prosecutorial authority.[48]

need for a hearing.' " *Ridenour*, 397 F.3d at 931 (quoting S. Rep. No. 99-345, at 26 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5291). Nevertheless, we conclude that Nevada's FCA grants private plaintiffs a right to a hearing on the Attorney General's motion to dismiss. *See* NRS 357.120(2).

[45]*Sequoia*, 151 F.3d at 1144-45 ("[T]he False Claims Amendments Act of 1986 'provides qui tam plaintiffs with a more direct role . . . in acting as a check that the Government does not neglect evidence, cause undue delay, or drop the false claims case without legitimate reason.' S. Rep. No. 99-345, at 25-26 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5291. This statement reflects congressional intent that the qui tam statute create only a limited check on prosecutorial discretion to ensure suits are not dropped without legitimate governmental purpose.").

[46]*Id.* at 1143, 1145. *Contra Swift v. U.S.*, 318 F.3d 250, 252-53 (D.C. Cir. 2003) (disagreeing with the *Sequoia* decision and concluding that the government has "unfettered" discretion to dismiss false claims actions *before the complaint is unsealed*).

[47]*Sequoia*, 151 F.3d at 1145 (quoting *U.S. ex rel. Sequoia Orange Co. v. Sunland Packing*, 912 F. Supp. 1325, 1347 (E.D. Cal. 1995)).

[48]*Id.* at 1145-46 (stating "the district court has respected the Executive Branch's prosecutorial authority by requiring no greater justification . . . than is mandated by the Constitution itself" and noting the discussion in *U.S. ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 756 (9th Cir. 1993) (discussing the federal FCA's implication of separation of powers concerns, recognizing the existence of "ample precedent" for requiring court approval of governmental dismissals of court proceedings, and refusing to "heighten constitutional concerns" "in the absence of any meaningful indication that [the notice and hearing] requirements pose significant barriers to the . . . exercise of . . . prosecutorial authority")). *But see Swift*, 318 F.3d at 253 (disagreeing with the *Sequoia* court's analysis); *Riley*, 252 F.3d at 753 (pointing out that the government's "unilateral power to dismiss an action" saves the FCA from unconstitutionally impinging the government's prosecutorial discretion) (citing *Searcy v. Philips Electronics North America Corp.*, 117 F.3d 154, 160 (5th Cir. 1997)).

In *Laraway*, the California Court of Appeal did not rely solely on *Sequoia* but also recognized that the meaning of the California FCA's "good cause" requirement must be determined through principles of statutory construction. Accordingly, the court also looked at the meaning of "good cause" in other contexts, the purpose of the FCA,[49] and legislative intent. Like the *Sequoia* court, the *Laraway* court concluded that a false claims complaint may be dismissed by the government when "the dismissal is rationally related to a legitimate government purpose, and not arbitrary, capricious, made in bad faith, based on improper or illegal motives, founded on an inadequate investigation, or pretextual."[50] The California court further indicated that, when considering the government's reasons for dismissal, the district courts should consider "any matter relevant to the issue, including the relative merits of the action, the interest of the qui tam plaintiff, the purposes underlying the False Claims Act, and the potential waste of government resources."[51]

We conclude that this test applies to Nevada's FCA.[52] Accordingly, when exercising its discretion to dismiss a false claims action

---

[49]Cal. Gov't Code § 12652(c)(1) (West 2005) contains language nearly identical to NRS 357.080(1), requiring courts to consider parties' best interests and the FCA's public purposes before dismissing an act instituted by a private plaintiff.

[50]*Laraway*, 116 Cal. Rptr. 2d at 831. *But see Ridenour*, 397 F.3d at 935-36 (declining to "engraft a good cause requirement on a government motion to dismiss," but nevertheless adopting the *Sequoia* standard for dismissal).

[51]*Laraway*, 116 Cal. Rptr. 2d at 831.

[52]*Cf. Sheriff v. Marcus*, 116 Nev. 188, 995 P.2d 1016 (2000) (discussing prosecutorial discretion in light of statutory amendments to good cause for dismissal requirements in a criminal matter); *Sandy v. District Court*, 113 Nev. 435, 439-42, 935 P.2d 1148, 1150-52 (1997) (discussing the district judge's role as the protector of the public interest when exercising authority to reject plea bargains and concluding that, without a finding that the prosecutor lacks a valid prosecutorial interest or other compelling consideration for refusing to go to trial, the district court may not reject a plea bargain based on cursory indications of the judge's view of public opinion or merely based upon disagreement with prosecutorial decisions) (citing *Sparks v. State*, 104 Nev. 316, 759 P.2d 180 (1988)); *Young v. District Court*, 107 Nev. 642, 648, 818 P.2d 844, 847 (1991) (recognizing that prosecutorial discretion to seek the death penalty may be abused when based on improper motive or unjustifiable and arbitrary classification). IGT notes at least one federal case in which the court determined that the federal act essentially prohibits judicial overview of the government's right to dismiss a false claims action. *See Swift*, 318 F.3d at 252. In Nevada, however, NRS 357.120(2) directly implicates the district court's authority to review the State's motions to dismiss for good cause.

for good cause,[53] the district court should apply the burden-shifting test articulated in *Laraway*.

## Recovering unpaid taxes under Nevada's FCA

The Attorney General, IGT, and the retailers make several arguments in support of writ relief. Specifically, they assert that Nevada's FCA does not include tax deficiencies within the realm of possible false claims, that the revenue statutes preempt the field of taxation so as to prohibit private actions to recover funds under the revenue statutes, and that good cause exists to dismiss the actions because the tax department is charged with determining these types of factual and interpretive matters under the tax statutes.

### The FCA's scope

Nevada's FCA was expressly modeled after the federal FCA.[54] As a result, understanding the federal act's background is helpful in appreciating the circumstances under which Nevada's FCA was passed. Originally enacted in 1863 after investigations brought to light various activities used during the Civil War to fraudulently obtain government funds, the federal FCA was intended to apply "to reach all types of fraud, without qualification, that might result in financial loss to the Government."[55] Accordingly, it was "broadly phrased to reach any person who [fraudulently] makes or causes to be made 'any claim' " of government funds.[56]

At that time, however, the federal FCA did not include any language permitting a person to maintain an FCA action based on allegations involving the fraudulent withholding of amounts due to the government.[57] Moreover, at that time, the federal Internal Revenue Code expressly stated that " '[n]o suit for the recovery of taxes . . . shall be commenced unless the Commissioner authorizes or sanctions the proceedings and the Attorney General directs

---

[53]*Laraway*, 116 Cal. Rptr. 2d at 829 (concluding that determination of good cause under California FCA is within trial court's discretion). *See generally Scrimer v. Dist. Ct.*, 116 Nev. 507, 513, 998 P.2d 1190, 1193-94 (2000) ("The determination of good cause [for dismissal under NRCP 4(i)] is within the district court's discretion."); *Colley v. State*, 105 Nev. 235, 236, 773 P.2d 1229, 1230 (1989) ('Appellate courts will not disturb a trial court's discretion in determining the existence of good cause [for delay in filing a post-conviction petition for a writ of habeas corpus] except for clear cases of abuse.").

[54]The federal FCA is currently codified at 31 U.S.C. §§ 3729-3733 (2000).

[55]*United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968) (citing Cong. Globe, 37th Cong., 3d Sess. 952-58).

[56]*Id.*

[57]*United States v. Western Pac. R. Co.*, 190 F.2d 243, 247 (9th Cir. 1951).

that the suit be commenced.' ''[58] Consequently, private FCA claimants were generally not permitted to bring any tax matters as federal false claims actions.[59]

The federal FCA was amended in 1986 to include what is commonly referred to as "reverse false claims," or "obligations," within its scope.[60] As a result, FCA liability was created for attempts to avoid paying sums owed to the government.[61] At the same time, however, an express "tax bar" was added to the federal FCA,[62] apparently because Congress recognized that, without it, tax deficiency allegations would fall within the purview of the reverse false claims provision.[63] Courts subsequently concluded that the tax bar was intended to codify existing case law.[64]

Although the Nevada FCA was adopted in 1999, after the 1986 amendments to the federal act, no Nevada FCA provision ex-

[58]*Id.* (quoting I.R.C. § 3740 (currently codified at I.R.C. § 7401 (2000)) ("No civil action for the collection or recovery of taxes . . . shall be commenced unless the Secretary authorizes or sanctions the proceedings and the Attorney General or his delegate directs that the action be commenced.")).

[59]*Id.*; *see also United States ex rel. U.S.–Namibia v. Africa Fund,* 588 F. Supp. 1350 (S.D.N.Y. 1984) (concluding that allegations that an organization made false statements to the IRS to obtain tax-exempt status did not support a false claims action, in part because there had been no "claim" for money and the FCA could not override the Internal Revenue Code provision stating that only the Secretary, through the Attorney General, can institute a civil action for the recovery of taxes); *Black Prince Distillery, Inc., v. United States,* 586 F. Supp. 1169 (D.N.J. 1984) (concluding that false claims for tax refunds did not fall within the federal FCA's scope); *Olson v. Mellon,* 4 F. Supp. 947 (W.D. Pa. 1933) (concluding that the federal FCA cannot support a suit for the recovery of internal revenue fines and penalties because Congress intended the IRS Commissioner to control all actions for the collection of internal revenue), *aff'd sub nom. U.S. ex rel. Knight v. Mellon,* 71 F.2d 1021 (3d Cir. 1934).

[60]*See* S. Rep. No. 99-345, at 18 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5283.

[61]*See Lissack v. Sakura Global Capital Markets,* 377 F.3d 145, 152 (2d Cir. 2004) ("[T]he 'reverse false claims' provision, [31 U.S.C.] § 3729(a)(7), . . . creates FCA liability for false statements designed to conceal, reduce, or avoid an obligation to pay money or property to the Government."); *accord American Textile Mfrs. Institute v. The Limited,* 190 F.3d 729, 733 (6th Cir. 1999).

[62]31 U.S.C. § 3729(e) (2000) (excluding "claims, records, or statements made under the Internal Revenue Code of 1986" from the federal FCA's purview).

[63]*See* S. Rep. No. 99-345, at 18 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5283 ("Although it is now apparent that the False Claims Act does not apply to income taxes cases, and the Committee does not intend that it should be so used, the act's earlier history serves to illustrate the problem which has come to be known as the 'reverse false claim . . . .' ").

[64]*See, e.g., Lissack,* 377 F.3d at 153, 156.

pressly excludes tax liabilities from the scope of possible false claims. Instead, NRS 357.040 generally imposes liability on any person who, "with or without specific intent to defraud," does one or more of several enumerated acts, such as knowingly submitting to the government a falsified claim for payment.[65] At issue here, NRS 357.040(1)(g), like the 1986 federal amendments, provides for reverse false claims. According to that provision, a reverse false claim occurs any time a person "[k]nowingly makes or uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the State or a political subdivision." Nevertheless, the petitioners argue that this provision prohibits tax-based claims even without an express exclusion because tax liabilities do not fall within the act's definition of "claim" or "obligation."

When interpreting a statute, a court should consider multiple legislative provisions as a whole.[66] The language of a statute should be given its plain meaning unless, in so doing, the spirit of the act is violated.[67] Thus, generally, a court may not look past the language of a facially clear statute to determine the legislature's intent.[68] An ambiguous statute, however, which contains language that might be reasonably interpreted in more than one sense or that otherwise does not speak to the issue before the court, may be examined through reason and considerations of public policy to determine the legislature's intent.[69]

The Attorney General first points out that the reverse false claim provision's plain language is ambiguous because legal use of the term "obligation" does not encompass merely contingent liabilities, while common usage of the term might encompass contingent, or even moral, liabilities.[70] Federal courts, in narrowly interpreting the federal FCA's similarly ambiguous reverse false claims provision,[71] have recognized that

---

[65]NRS 357.040(1)(a).

[66]*University Sys. v. Nevadans for Sound Gov't*, 120 Nev. 712, 731, 100 P.3d 179, 193 (2004).

[67]*Id.*

[68]*Id.* (citing *McKay v. Bd. of Supervisors*, 102 Nev. 644, 648, 730 P.2d 438, 441 (1986)).

[69]*Id.*; *Clark County v. Sun State Properties*, 119 Nev. 329, 334, 72 P.3d 954, 957 (2003); *Salas v. Allstate Rent-A-Car, Inc.*, 116 Nev. 1165, 1168, 14 P.3d 511, 514 (2000).

[70]*See American Textile*, 190 F.3d at 736 (recognizing the inherent ambiguity of the term "obligation" in the federal FCA); *Beazer Homes Nevada*, 120 Nev. at 585, 97 P.3d at 1138-39 (recognizing the ambiguity created when a statute uses a legal term of art that differs from that term's common usage).

[71]*See* 31 U.S.C. § 3729(a)(7) (2000).

> [a] defendant does not execute a reverse false claim by engaging in behavior that might or might not result in the creation of an obligation to pay or transmit money or property to the government. Contingent obligations—those that will arise only after the exercise of discretion by government actors—are not contemplated by the [federal FCA].[72]

In other words, the reverse false claims provision includes only those obligations that arise out of an economic relationship, such as an affirmative duty to pay imposed by contract, statute or regulation, between the government and the defendant.[73]

When the Legislature adopts a statute substantially similar to a federal statute, "'a presumption arises that the legislature knew and intended to adopt the construction placed on the federal statute by federal courts.'"[74] Consequently, we agree with the Attorney General that, in Nevada, reverse false claims must be based upon an affirmative duty to pay, such as that imposed under a statutory or regulatory scheme.[75]

But we fail to see how, as petitioners suggest, tax liabilities are "mere contingent liabilities" until they "are self-reported and remitted to the Department of Taxation, or until they are assessed or levied by the Department of Taxation pursuant to an audit," so that they cannot fall within the scope of "obligations" subject to reverse false claims actions. One need only refer to Nevada's revenue statutes to conclude that the duty to pay taxes is a present, affirmative duty and is not contingent. For example, NRS 372.105 provides that "[f]or the privilege of selling tangible personal property at retail a tax is hereby imposed upon all retailers at the rate of 2 percent of the gross receipts of any retailer from the sale of all

---

[72]*American Textile*, 190 F.3d at 738.

[73]*U.S. ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 657 (5th Cir. 2004); *American Textile*, 190 F.3d at 737; *compare U.S. v. Q Intern. Courier, Inc.*, 131 F.3d 770, 773-74 (8th Cir. 1997) (suggesting that a statutory duty to pay certain postage would constitute an "obligation" under the federal FCA's reverse false claims provision but concluding that the statutes at issue created only potential penalty liability, were not for "a fixed sum that is immediately due," and did not support false claims act liability), *with U.S. v. Raymond & Whitcomb Co.*, 53 F. Supp. 2d 436, 445-46 (S.D.N.Y. 1999) (distinguishing *Q International* because, according to the statutory nonprofit mailing rate provisions at issue in *Raymond & Whitcomb*, a "finding of wrongful use of the non-profit rate yields a clear actual obligation to pay the deficiency").

[74]*Edgington v. Edgington*, 119 Nev. 577, 584, 80 P.3d 1282, 1288 (2003) (quoting *State, Bus. & Indus. v. Granite Constr.*, 118 Nev. 83, 88, 40 P.3d 423, 426 (2002)).

[75]*See American Textile*, 190 F.3d at 738.

tangible personal property sold at retail in this State.'' NRS 372.185(1) provides that ''[a]n excise tax is hereby imposed on the storage, use or other consumption in this state of tangible personal property purchased from any retailer . . . for storage, use or other consumption in this state at the rate of 2 percent of the sales price of the property.'' Accordingly, the term ''obligation'' does not automatically exclude tax liabilities from the FCA's scope.

Any ambiguity caused by the Legislature's failure to mention taxes in the FCA is easily resolved by applying basic principles of statutory construction to ascertain the Legislature's intent. This court presumes that the Legislature enacts a statute '' 'with full knowledge of existing statutes relating to the same subject.' ''[76] Thus, the presumption that the Legislature, in enacting a state statute similar to a federal statute, intended to adopt the federal courts' construction of that statute, is rebutted when the state statute clearly reflects a contrary legislative intent.[77]

Nevada's FCA, in stark contrast to the federal legislation after which it was modeled, includes language allowing reverse false claims but omits any provision barring persons from bringing false claims actions based on tax liabilities.[78] Thus, facially and otherwise, the inclusion of ''obligations'' within the FCA's scope, coupled with the omission of an express tax bar, conclusively demonstrates the Legislature's intent to include tax liability matters within the realm of possible false claims.

### FCA and revenue law interaction

Moreover, the Legislature's inclusion of tax matters within the FCA's scope does not conflict with any provision in Nevada's revenue laws, codified at NRS Title 32. Unlike the Internal Revenue Code, which permits an action for the recovery of taxes only upon the Internal Revenue Service Commissioner's (Secretary's) approval and the Attorney General's direction, Nevada's revenue laws merely install in the tax department general supervisory powers over Nevada's revenue system[79] and authorize the Nevada Tax

---

[76]*State, Div. of Insurance v. State Farm*, 116 Nev. 290, 295, 995 P.2d 482, 486 (2000) (quoting *City of Boulder v. General Sales Drivers*, 101 Nev. 117, 118-19, 694 P.2d 498, 500 (1985)).

[77]*Edgington*, 119 Nev. at 584, 80 P.3d at 1288 (citing *Granite Constr.*, 118 Nev. at 88, 40 P.3d at 426, and *Sharifi v. Young Bros., Inc.*, 835 S.W.2d 221, 223 (Tex. App. 1992)).

[78]*Cf.* Cal. Gov't Code § 12651(f) (West 2005) (''This section does not apply to claims, records, or statements made under the Revenue and Taxation Code.'').

[79]NRS 360.200.

Commission "to direct what proceedings, actions or prosecutions shall be instituted to support the law."[80] Neither power grants any entity sole control over all proceedings related to tax issues, nor does it limit actions taken under other statutes, such as the FCA. Indeed, despite the language quoted above, the Tax Commission shares its statutory authority to institute actions to collect taxes owed with, for example, the tax department,[81] the Department of Motor Vehicles,[82] and the board of county commissioners.[83] As a result, neither the tax department nor the Tax Commission retain exclusive jurisdiction over all matters relating to taxation simply because those matters attempt to collect monies owed under the revenue statutes.

Title 32 includes provisions permitting specified authorities to recover funds under the revenue statutes but details no process allowing a private person to do the same. By enacting the FCA, the Legislature intended to "bolster" these existing resources by creating a new, private right of action to pursue any matter falling within the FCA's scope.[84] Since one of the FCA's primary purposes is to promote recovery of the maximum amount of fraudulently withheld or claimed state funds possible,[85] the FCA's scope must be broadly construed, when feasible, to accomplish this purpose.[86] As a result, and because no provision in the revenue statutes grants any entity exclusive jurisdiction over tax matters, we must conclude

---

[80] NRS 360.260(1).

[81] NRS 360.4193; *see also* 97-01 Op. Att'y Gen. 1 (1997), *clarified by* 97-09 Op. Att'y Gen 87 (1997).

[82] NRS 360A.260.

[83] NRS 361.635.

[84] *See* Hearing on S.B. 418 Before the Senate Government Affairs Comm., 70th Leg. (Nev. March 31, 1999); *cf. Middlesex Cty. Sewerage Auth. v. Sea Clammers*, 453 U.S. 1, 20 (1981) (recognizing the foreclosure of § 1983 actions based on water pollution law violations by the enactment of specific statutory remedies of the same, when the specific remedies included citizen-suit provisions).

[85] *See generally* Hearing on S.B. 418 Before the Senate Government Affairs Comm., 70th Leg. (Nev., March 31, 1999); *United States v. Neifert-White Co.*, 390 U.S. 228, 232-33 (1968) (recognizing that congressional intent behind the federal FCA " 'was broadly to protect the funds and property of the Government from fraudulent claims, regardless of the particular form, or function, of the government instrumentality upon which such claims were made' " and noting that the Court "has consistently refused to accept a rigid, restrictive reading" of the federal FCA (quoting *Rainwater v. United States*, 356 U.S. 590, 592 (1958))).

[86] *See McKay v. Bd. of Supervisors*, 102 Nev. 644, 650-51, 730 P.2d 438, 442 (1986) ("The meaning of the words used may be determined by examining the context and the spirit of the law or the causes which induced the legislature to enact it.").

that such matters are not excluded from the FCA's scope simply because they arise out of allegations based on monies owed under NRS Title 32.

### The Laraway "good cause for dismissal" analysis

Finally, petitioners and amicus curiae Nevada Taxpayers' Association assert that, even if tax matters are not obviously barred from being raised in false claims actions, the FCA directly conflicts with the protective purposes behind the statutory tax scheme so that the two schemes cannot coexist peacefully. The Attorney General and IGT argue, and amicus curiae Nevada Taxpayers' Association suggests, that allowing FCA actions based on tax matters will result in the creation of two separate, inconsistently and disparately treated classes of taxpayers. Such a result, they argue, implicates taxpayers' equal protection rights, which require the uniform and consistent interpretation and application of tax laws under the Taxpayers' Bill of Rights.[87]

"[W]hen separate [state] statutes are potentially conflicting, [this court] attempt[s] to construe both statutes in a manner to avoid conflict and promote harmony."[88] Because we conclude that the two statutory schemes' collection provisions were intended to primarily encompass different types of situations—those which require the specialized knowledge and function of the tax department to resolve legal disputes and those in which truly fraudulent conduct is discovered by private persons, or whistleblowers— we disagree that FCA actions necessarily conflict with or impermissibly interfere with taxpayer protections so as to require a ban on all false claims actions based on tax matters. We do, however, recognize that in some instances the need for consistent interpretation and application of the tax statutes may properly form a basis for good cause dismissal.

Reverse false claims are intended to apply to situations in which it is discovered that a person "knowingly" exploited a false record to conceal, avoid or decrease an obligation to pay.[89] A "person acts 'knowingly' with respect to information if he: (a) Has knowledge of the information; (b) Acts in deliberate ignorance of whether the information is true or false; or (c) Acts in reckless disregard of the truth or falsity of the information."[90] So as to avoid

---

[87]NRS 360.291(1)(a).

[88]*Beazer Homes Nevada*, 120 Nev. at 587, 97 P.3d at 1140.

[89]NRS 357.040(1)(g).

[90]NRS 357.040(2).

punishing " 'honest mistakes or incorrect claims submitted through mere negligence,' "[91] the requisite scienter has been defined as " 'the knowing presentation of what is known to be false.' "[92] And "known to be false" does not mean either "[t]o take advantage of a disputed legal question,"[93] or " 'scientifically untrue; it means a lie.' "[94]

In many cases, allegations that a taxpayer has failed to pay the correct amount of taxes due under the revenue statutes invoke a good-faith dispute regarding the application of the law to particular factual circumstances; in other words, the allegations amount to no more than mere accusations that the taxpayer has taken advantage of a disputed legal question.[95] To resolve such allegations, the revenue statutes' application to the matter's factual circumstances must be evaluated.

But, as this court has previously pointed out, the determinations of fact-based legal issues under the tax statutes should not be made by the courts; rather, those determinations are "best left to the Department of Taxation, which can utilize its specialized skill and knowledge to inquire into the facts of the case."[96] Further, we have repeatedly recognized the authority of agencies, like the tax department and Tax Commission, to interpret the language of a statute that they are charged with administering; as long as that interpretation is reasonably consistent with the language of the statute, it is entitled to deference in the courts.[97] Thus, a claim that

---

[91]*U.S. ex rel. Hochman v. Nackman*, 145 F.3d 1069, 1073 (9th Cir. 1998) (quoting S. Rep. No. 99-345, at 7 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5272).

[92]*Id.* (quoting *U.S. ex rel. Hagood v. Sonoma County Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991)).

[93]*Hagood*, 929 F.2d at 1421.

[94]*Hochman*, 145 F.3d at 1073 (quoting *U.S. ex rel. Anderson v. Northern Telecom, Inc.*, 52 F.3d 810, 815-16 (9th Cir. 1995)).

[95]*See Estate of Kluener v. C.I.R.*, 154 F.3d 630, 634 (6th Cir. 1998) ("'Tax avoidance is entirely legal and legitimate. Any taxpayer 'may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes.'" (quoting *Helvering v. Gregory*, 69 F.2d 809, 810 (2d Cir. 1934), *aff'd*, 293 U.S. 465 (1935))).

[96]*Malecon Tobacco v. State, Dep't of Taxation*, 118 Nev. 837, 841, 59 P.3d 474, 477 (2002).

[97]*Meridian Gold v. State, Dep't of Taxation*, 119 Nev. 630, 636-37, 81 P.3d 516, 520 (2003) (recognizing that courts give great deference to Tax Commission statutory interpretation that is consistent with language of statute); *Malecon Tobacco*, 118 Nev. at 841 & 842 n.15, 59 P.3d at 477 & n.15 (recognizing that, in light of the fact-based constitutional questions raised by the Taxpayers' lawsuit, should this court "address the Taxpayers' claims without

cannot be resolved without evaluating the facts of a particular case under the revenue statutes—for example, when there exists a legitimate dispute on whether taxes are actually owed under Title 32— does not fall within the FCA's definition of fraudulent acts or its purpose to expose specific instances in which a person "lies" to the government, and it is not properly resolved by the courts in the first instance.

Instead, the FCA is meant to encourage private persons to reveal instances when a person has cheated or attempts to cheat the government by submitting documents containing manufactured or omitted facts or data. For example, an FCA claim might properly be maintained on allegations that state money was fraudulently withheld by a company that keeps two sets of books reporting the same transactions—one that accurately reflects the sales' gross receipts and one that does not—and then underreports its state sales tax liabilities based on the untrue data.

While both types of allegations, those involving fact-based legal issues and those involving the filing of fraudulent forms, are based on an underlying tax statute, resolution of the former type requires the kind of evaluation that is entrusted to the tax department's expertise and, thus, is improperly maintained under the FCA. The latter type is perhaps most likely to be discovered by a private whistleblower, does not require the tax department's expertise, and is properly resolved by a court under the FCA.

When the tax department's expertise is not implicated in a false claims action, an argument that the claim is improper under the FCA because it involves a tax matter must fail and cannot signify a legitimate government purpose for "good cause" dismissal. But if the Attorney General moves to dismiss an action because, based on the allegations in the complaint and information relevant thereto, it appears that the action presents issues better suited to resolution through the tax department's specialized knowledge, the Attorney General has asserted good cause for dismissal, and absent a showing of improper conduct, the district court is obligated to dismiss the action. In this manner, taxpayers' rights under the

the benefit of the Department of Taxation's expertise, we would usurp the Department's role as well as contravene the Supreme Court's directive to give deference to an agency's reasonable interpretation of the law and facts at issue''); *accord United States v. State Engineer*, 117 Nev. 585, 589, 27 P.3d 51, 53 (2001); *Reno v. Reno Police Protective Ass'n*, 118 Nev. 889, 900, 59 P.3d 1212, 1219 (2002); *Sierra Pac. Power v. Department Taxation*, 96 Nev. 295, 297, 607 P.2d 1147, 1148 (1980).

revenue statutes, including the right to a uniform and consistent application of the statutes,[98] will be preserved.[99]

*The district courts' refusals to dismiss*

*No. 43882 (McAndrews)*

In the Attorney General's motion to dismiss the McAndrews action, it was pointed out that the complex issues arising out of the allegations in McAndrews' complaint should be addressed not by the court, but by the tax department and Tax Commission, which have authority to interpret the revenue laws. The Attorney General's desire to defer cases involving disputed legal issues and intensive factual evaluations to the governmental agency statutorily charged with administering the tax laws is rationally related to the legitimate (and moreover, legislatively mandated) endeavor of maintaining uniformity and consistency in the tax laws. As noted above, such cases are not properly maintained in the courts. Accordingly, the Attorney General articulated a legitimate government purpose for dismissal.

Although the district court suggested that the Attorney General had at least shown some legitimate purpose, it refused to dismiss the action based on its considerations of the FCA's purpose and McAndrews' interests. While, as we noted above, those are important factors to consider in determining whether the parties have met their burdens under the *Laraway* test, once a legitimate reason for dismissal has been proffered, the burden shifts to the private plaintiff to demonstrate that the reason is arbitrary, capricious, made in bad faith, based on improper or illegal motives, founded on inadequate investigation, or pretextual.

Here, McAndrews failed to meet this significant burden to show that the Attorney General acted improperly in moving to dismiss the false claims action. McAndrews only suggested that the Attorney General was acting arbitrarily or capriciously in encouraging him to file suit under the FCA and then moving to dismiss it, in order to let IGT escape responsibility for paying the taxes alleged due and avoid paying McAndrews a portion of any recovery. He

---

[98]*See* NRS 360.095(5) (providing that "[a]udits and other procedures for enforcement must be applied as uniformly as is feasible, not only among persons subject to a particular tax but also as among different taxes"); *see also* NRS 360.291(1)(a) (declaring that each taxpayer has the right to be treated by the tax department with "uniformity, consistency and common sense").

[99]We agree with petitioners that the courts are able to fashion adequate protections of FCA defendants' taxpayer rights under NRS Title 32, in any actions in which those rights are implicated.

was also concerned that his whistleblower protections under the FCA would be impinged by dismissal.

Even if McAndrews was encouraged to file a false claims action, an allegation disputed by the Attorney General, the Attorney General's reason for dismissal was not arbitrary or capricious; he has taken the same stance in all of the tax-based false claims actions filed in Nevada. Further, the Attorney General has indicated that any taxes withheld by IGT are being pursued through the tax department's audit process. And, while dismissal based solely on a motivation to deprive a private plaintiff of his share of any recovery or protections would be improper and would effectively defeat the purpose of the good cause requirement altogether, nothing in the record supports an allegation that the Attorney General's motivation in this case was to avoid paying McAndrews or to improperly deprive him of the FCA's whistleblower protections. Moreover, we see no reason why the protections offered whistleblowers under the FCA would necessarily be unavailable if the action is dismissed for good cause.[100] Accordingly, McAndrews failed to demonstrate that the Attorney General's conduct was improper, and the district court inappropriately based its good cause determination solely on considerations of McAndrews' interests and the FCA's purpose.

As good cause for dismissal was demonstrated and not rebutted by McAndrews,[101] the district court manifestly abused its discretion by refusing to dismiss that case.

### No. 43953 (Beeler, Schad & Diamond)

In the Beeler, Schad & Diamond actions, the Attorney General argued before the district court that good cause to dismiss exists because the law firm's false claims actions require the factual determination of whether the retailers were indeed entities subject to Nevada sales and use tax under the statutes[102] and the resolution

---

[100]*See U.S. ex rel. McKenzie v. Bellsouth Tel.*, 123 F.3d 935 (6th Cir. 1997) (concluding that the qui tam plaintiff had stated a retaliation claim under the federal FCA, even though her false claims action was properly dismissed for lack of subject matter jurisdiction).

[101]We note that McAndrews contests the district court's refusal to permit him to present witness testimony regarding the motion to dismiss, since NRS 357.120(2) allows a private plaintiff to ''present evidence at the hearing.'' The district court concluded, however, that the testimony McAndrews sought to illicit was either irrelevant or improper. Having reviewed the record, we agree with the district court; accordingly, the district court did not abuse its discretion in refusing to allow the witnesses to testify. *See Barry v. Lindner*, 119 Nev. 661, 667, 81 P.3d 537, 541 (2003) (noting that ''[t]he decision whether to permit a witness to testify is within the sound discretion of the district court'').

[102]*See* NRS 372.728; NRS 374.728.

of arguable legal issues regarding whether the sales of the retailers in question had a sufficient nexus with Nevada to hold the retailers liable, in light of federal legal considerations, for their alleged failure to pay Nevada taxes.[103] As asserted by the Attorney General, these are exactly the types of determinations better left to the tax department in order to promote consistency and uniformity.

Although Beeler, Schad & Diamond asserts that its allegations are consistent with state and federal law permitting the imposition of taxes on the retailers, the matter nevertheless requires a factual evaluation to be made under the tax statutes regarding whether taxes are owed under the circumstances alleged; consequently, the Attorney General asserted a legitimate government purpose for dismissal. As Beeler, Schad & Diamond failed to then establish that the Attorney General's conduct was improper under *Laraway*, the district court should have granted the motion to dismiss the actions for good cause.

## CONCLUSION

A false claims action involving allegations that by reference incorporate the revenue statutes is not necessarily excluded from the realm of permissible claims under Nevada FCA. When, however, the resolution of a false claims action requires a factual evaluation under, or legal interpretation of, the revenue statutes—for instance, in situations involving arguable distinctions on whether taxes are owed under the circumstances—that action should be resolved, in the first instance, by the entity entrusted to maintain consistency and uniformity in the tax laws. The demonstration of such a factual evaluation or legal interpretation constitutes good cause for the action's dismissal.

Here, the Attorney General proffered a legitimate government purpose rationally related to the McAndrews action's dismissal, and McAndrews failed to demonstrate that the Attorney General's motion was improper. Accordingly, the district court manifestly abused its discretion in refusing to dismiss the McAndrews action, and extraordinary writ relief is warranted. The writ petition in Docket No. 43882 is granted; we direct the clerk of this court to issue a writ of mandamus directing the district court to grant the Attorney General's motion to dismiss McAndrews' false claims action.

Similarly, the Attorney General articulated a legitimate government purpose for dismissing the Beeler, Schad & Diamond actions, and his conduct in so doing was not shown to be improper; accord-

---

[103]*See, e.g., Quill Corp. v. North Dakota*, 504 U.S. 298 (1992) (reiterating that an out-of-state retailer must have sufficient "minimum contacts" with a state before that state may impose its use tax on that retailer).

ingly, the district court manifestly abused its discretion in refusing to dismiss these actions. Therefore, the petition for a writ of mandamus in Docket No. 43953 is granted; we direct the clerk of this court to issue a writ of mandamus directing the district court to grant the Attorney General's motion to dismiss the underlying false claims actions.

GIBBONS, DOUGLAS, HARDESTY and PARRAGUIRRE, JJ., concur.

ROSE, C. J., with whom MAUPIN, J., agrees, dissenting:

The majority opinion rightly concludes that tax liability matters are included as a possible false claim under Nevada's False Claims Act (FCA). However, it then goes on to conclude that for policy considerations, an alleged false tax claim should not be included in the definition of false claims if facts must be evaluated or the revenue statutes interpreted. I have two objections to this latter conclusion. First, it is the Legislature's function to determine the policy of revenue collection, and the Legislature has placed no such limitation in the FCA. Second, permitting the Attorney General to dismiss a whistleblower's complaint on the grounds presented, and belatedly presented in the Beeler, Schad & Diamond, P.C., actions, will have a chilling effect on all future whistleblower actions, effectively discouraging whistleblowers from coming forward with information of wrongful conduct.

To justify negating a duly passed law, the majority opinion states that fact-based legal determinations under the tax statutes are "best left to the Department of Taxation" and cites *Malecon Tobacco v. State, Department of Taxation*[1] as authority for this proposition. *Malecon* concerned whether a taxpayer could file a class action lawsuit contesting the collection of certain taxes and the constitutionality of the NRS 370.440 tax levy. The taxpayer was not suing under any specific statute permitting a lawsuit, as in our present cases. This court concluded that the taxpayer had not exhausted its administrative remedies with the Nevada Tax Commission and dismissed the case. However, several things differentiate these cases from *Malecon*. These whistleblower cases are not brought by a taxpayer seeking relief, as in *Malecon*. Instead, the whistleblowers brought suit under a specific statutory authority, the FCA, and they are opposed by taxpayers claiming that they owe no taxes. While the general approach of requiring taxpayers to exhaust administrative remedies before filing a legal action is a good one, it has no application in these factually different cases.

The majority opinion then goes on to state that the FCA is meant to encourage citizens to reveal tax cheats who submit doc-

[1]118 Nev. 837, 59 P.3d 474 (2002).

uments containing false facts or data. However, nowhere in the FCA does it state this limitation, and the legislative history provides no indication that this limitation was intended. The FCA encourages citizens to report all attempts to avoid an obligation to pay money to the state, and I have no idea where the majority opinion comes up with this limitation except by judicially declaring that it is so. The end result of judicially engrafting a limitation onto the FCA is the elimination of all those cases where a person does not pay a governmental obligation.

Moreover, allowing the Attorney General to dismiss a case for this reason, especially after the Attorney General initially declined to intervene, will have a chilling effect on whistleblowers coming forward to report wrongdoing. The purpose of a whistleblower statute is to encourage people to reveal acts taken to cheat the government out of obligations owed. In return, the whistleblower is awarded compensation from the amount collected and protected from an employer's harassment, coercion, or other retaliation. Most states have adopted some type of whistleblower statute,[2] and courts reviewing those statutes generally broadly interpret them to carry out their "good government" purpose.[3]

By giving the whistleblower statute a very narrow interpretation and effectively curtailing its use in many cases, the majority opinion does just the opposite. The whistleblower act is designed to encourage citizens to report those who do not meet their obligations to the state and thereby secure the fulfillment of obligations duly owed. The two district judges who denied the Attorney General's requests to dismiss these whistleblower actions clearly understood this. The majority opinion thwarts this noble purpose and provides a disincentive to all future whistleblowers—leaving the whistleblowers out in the cold without any protection or compensation. Nevada's whistleblower act has now been gutted by judicial fiat, and this is not what the Legislature intended or anticipated. For these reasons, I dissent.

---

[2]*E.g.*, Cal. Gov't Code § 12653 (West 2005).

[3]*E.g. Spencer v. Barnwell County Hosp.*, 444 S.E.2d 538, 540 (S.C. Ct. App. 1994).